PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 10-4725
———

KARIM ELEY,

Appellant

v.

CHARLES ERICKSON, Superintendent;
ATTORNEY GENERAL OF PENNSYLVANIA;
DEPUTY DISTRICT ATTORNEY
OF DAUPHIN COUNTY
———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-08-cv-00090)
District Judge:  Honorable A. Richard Caputo
———

Argued October 3, 2012
Before:  FUENTES, FISHER and COWEN, *Circuit Judges*.

(Filed: April 9, 2013)

Peter A. Levin (ARGUED)
1927 Hamilton Street
Philadelphia, PA  19130
        *Counsel for Appellant*

Jason E. McMurry (ARGUED)
Dauphin County Office of District Attorney
Front & Market Streets
Harrisburg, PA   17101
        *Counsel for Appellees, Charles*
        *Erickson and Deputy District*
        *Attorney of Dauphin County*

_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Karim Eley, a prisoner of the Commonwealth of Pennsylvania in custody of the State Correctional Institution – Rockview, seeks federal *habeas* relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  After a joint trial with Lester Eiland and Edward Mitchell in the Dauphin County Common Pleas Court, a jury convicted Eley of second-degree murder, 18 Pa. Cons. Stat. § 2502(b), robbery, § 3701, and conspiracy to commit robbery, § 903, for his role in the murder and robbery of Angel DeJesus in Harrisburg, Pennsylvania, in July 2000. Eley now claims that (1) the evidence was insufficient to support his convictions in violation of the Due Process Clause

2

of the Fourteenth Amendment under *Jackson v. Virginia*, 443 U.S. 307 (1979); (2) his non-testifying co-defendants' confessions were admitted against him in violation of the Confrontation Clause of the Sixth Amendment under *Bruton v. United States*, 391 U.S. 123 (1968), *Richardson v. Marsh*, 481 U.S. 200 (1987), and *Gray v. Maryland*, 523 U.S. 185 (1998); and (3) the trial judge's reasonable doubt jury instruction reduced the Commonwealth's burden of proof in violation of the Due Process Clause of the Fourteenth Amendment under *Boyde v. California*, 494 U.S. 370 (1990). The District Court rejected Eley's claims and denied his petition. For the reasons stated below, we will reverse.

I.

A.

On July 5, 2000, cab driver Angel DeJesus suffered multiple fatal gunshot wounds during a robbery while his taxi was parked at the intersection of Kittatinny and Hummel Streets in Harrisburg, Pennsylvania. Before oral argument, we requested that the Commonwealth of Pennsylvania submit a letter specifying the evidence reflected in the record from which the jury could have rationally concluded beyond a reasonable doubt that Karim Eley was guilty of second-degree murder, robbery, and conspiracy to commit robbery in

connection with these crimes.[1]  The Commonwealth directed our attention to the evidence we now summarize.[2]

Vivian Martinez testified that she remembered that DeJesus, her fiancée, had purchased a pouch to hold his money a couple of days before July 4, 2000.  She also knew that he always kept this money pouch in his taxi while he was working.  And she believed that he had about $250.00 in his possession around 2:45 a.m. on July 5, 2000.

Guadalupe Fonseca testified that he was standing outside his home on Kittatinny near the intersection with Hummel around 5:00 a.m. on July 5, 2000.  He saw three African-American men standing by a taxi, and he did not see anyone else in the general area.  He then observed one of the three men enter the taxi, and he heard two gunshots.  At the same time, he noticed that the other two men remained "right beside" the taxi.  App. at 85.  He next watched the first man exit the taxi and rejoin the other two men by the side of the

---

[1]  Karim Eley declined our invitation to submit a response to the Commonwealth of Pennsylvania's letter.

[2]  Because one of Eley's claims is a challenge to the sufficiency of the evidence supporting his convictions, we review the facts in the light most favorable to the Commonwealth, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and we resolve conflicting inferences in the Commonwealth's favor, *id.* at 326.

4

taxi, and he heard a third gunshot.[3] He finally saw all three men depart down Hummel together.

Jennifer McDonald testified that after 4:30 a.m. on July 5, 2000, she was walking down Hummel towards her home on Kittatinny. She passed by three men, who she identified as Eley, Lester Eiland, and Edward Mitchell, hanging out in the area of an abandoned house on Hummel right before the intersection with Kittatinny. Eley recognized her and did a little dance, and she called him stupid. She turned down Kittatinny, and a taxi passed her travelling toward the intersection with Hummel. About a minute and a half later, she heard a slam, and she looked back up Kittatinny toward the intersection with Hummel. She saw the taxi stopped at the intersection, but she did not see Eley, Eiland, or Mitchell around the taxi. About five minutes after she arrived at her home, she heard police sirens. She was aware that Eley, Eiland, and Mitchell "hung out" at the abandoned house. *Id.* at 111.

Rufus Hudson testified that he was driving around Hummel and Kittatinny from 2:30 a.m. to 5:00 a.m. on July 5, 2000. Around 3:00 a.m., he identified Eley, Eiland, and Mitchell, who were standing at the intersection of Hummel and Kittatinny. Then, around 4:00 a.m., he recognized DeJesus in his taxi, which was parked on 13th Street at the intersection with Kittatinny. Later, he again saw DeJesus in

---

[3] At oral argument, the Commonwealth stated that about five seconds elapsed between the second and third gunshots. Eley did not rebut this fact.

his taxi, which at that time was parked on Hummel at the intersection with Kittatinny, and he again noticed Eley, Eiland, and Mitchell standing at the intersection of Hummel and Kittatinny. Finally, around 5:00 a.m., he watched the defendants run "real fast" away from the taxi, which was still parked at the intersection of Hummel and Kittatinny, towards the abandoned house. *Id.* at 116. He knew that Eley, Eiland, and Mitchell hung out in the area of Hummel and Kittatinny near the abandoned house "every day." *Id.* at 118.

Cindy Baldwin, a Harrisburg Police Bureau forensic investigator, testified that on July 5, 2000, she responded to the intersection of Hummel and Kittatinny where she searched the taxi and collected two shell casings. She also went to the Hershey Medical Center where she gathered DeJesus's clothing, which did not include any cash, wallet, or purse. She then searched the taxi a second time, and again failed to recover any cash, wallet, or purse. On July 7, 2000, she was present at DeJesus's autopsy and determined that he had been shot three times with a twenty-five caliber gun. She next searched the taxi a third time and discovered a third shell casing. She later learned that all three shell casings may have been fired from the same twenty-five caliber gun.

Dr. Wayne Ross, a Dauphin County Coroner's Office forensic pathology expert, testified that on July 7, 2000, he performed DeJesus's autopsy. He observed that DeJesus had suffered three gunshot wounds to the head and neck area. He opined that DeJesus's cause of death was homicide by multiple gunshot wounds to the head.

David Lau, a Harrisburg Police Bureau criminal investigator, testified that on July 7, 2000, he recovered two firearms and three shotguns from the abandoned house. On July 14, 2000, at the Harrisburg Police Bureau, he took a statement from Eley. Eley told him that he had not been in the area of Hummel and Kittatinny for the past three weeks. Eley specifically said that between 4:00 a.m. and 5:00 a.m. on July 5, 2000, he had been with various acquaintances, friends, and family at several locations other than Hummel and Kittatinny.

## B.

Eley, Eiland, and Mitchell were arrested, charged, and jointly tried before three successive juries in the Dauphin County Common Pleas Court. The first two trials ended in mistrials.[4] At the third trial, Eley was convicted of second-degree murder, 18 Pa. Cons. Stat. § 2502(b), robbery, § 3701, and conspiracy to commit robbery, § 903. He was acquitted of conspiracy to commit murder. *Id*. He was sentenced to consecutive terms of imprisonment of life without parole for

---

[4] At the first trial, the jury deadlocked. At the second trial, a police witness recited Eley's name while reading Edward Mitchell's confession, in violation of *Bruton v. United States*, 391 U.S. 123 (1968).

7

second-degree murder, seven to twenty years for robbery, and four to twelve years for conspiracy to commit robbery.[5]

On direct appeal, Eley raised numerous substantive issues, including whether (1) there was sufficient evidence to convict him; (2) he should have been granted a severance; and (3) the trial judge biased the jury by telling it to ignore the possibility that someone other than he and his co-defendants committed the crimes. The Common Pleas Court upheld his convictions on the merits, and a divided panel of the Pennsylvania Superior Court affirmed his convictions on

---

[5] On direct appeal, Eley challenged the legality of his sentence. Concluding that the Dauphin County Common Pleas Court had erred in failing to merge Eley's sentences for second-degree murder and robbery, the Pennsylvania Superior Court vacated his sentence. *Commonwealth v. Eley*, 835 A.2d 830 (Pa. Super. Ct. 2003) (unpublished opinion). On remand, Eley was re-sentenced to consecutive terms of imprisonment of life without parole for second-degree murder and robbery and four to twelve years for conspiracy to commit robbery.

the merits under Pennsylvania law.[6,7] *Commonwealth v. Eley*, 835 A.2d 830 (Pa. Super. Ct. 2003) (unpublished opinion). The Pennsylvania Supreme Court denied his petition for allowance of appeal. *Commonwealth v. Eley*, 842 A.2d 405 (Pa. 2004).

On collateral appeal under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 *et seq.*, Eley re-cast the substantive issues he had raised on direct appeal as ineffective assistance challenges based on his counsel's failure to frame his claims under federal law. The

---

[6] The dissenting judge took issue with the Superior Court majority's resolution of Eley's jury instruction claim. Specifically, the dissent concluded that the trial judge "on several occasions, suggested that the jury could ignore or disregard collateral issues about which they had doubt," such as "the credibility of witnesses who claimed to be at the scene of the crime." App. at 273. Thus, the dissent would have held that the "jury instructions were unclear, confusing and prejudicial," vacated the judgment of sentence, and remanded the case for a new trial. *Id.* at 274.

[7] While Eley's direct appeal to the Superior Court was pending, he unsuccessfully moved for a new trial based on after-discovered evidence in the Common Pleas Court, alleging that the murder weapon had been found in the possession of a third-party.

Common Pleas Court dismissed his PCRA petition.[8]  The Superior Court affirmed, *Commonwealth v. Eley*, 929 A.2d 237 (Pa. Super. Ct. 2007) (unpublished opinion), and also denied his request for re-argument.  The Supreme Court again denied his petition for allowance of appeal.  *Commonwealth v. Eley*, 940 A.2d 362 (Pa. 2007).

Eley filed a *pro se habeas* petition under 28 U.S.C. § 2254, claiming:  (1) "[u]nder *Jackson v. Virginia*, evidence was insufficient to prove guilt;" (2) "[i]mproper redaction of codefendants' statements, misuse of same by prosecutor and improper jury instruction;" and (3) "[i]mproper, unconstitutional reasonable doubt instruction."[9]  Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a

---

[8] While Eley's first PCRA petition was pending before the Common Pleas Court, he filed a second PCRA petition based on additional after-discovered evidence.  He alleged that a third-party had admitted to being one of the three persons involved in the crimes and had implicated two additional third-parties in the crimes.  The Common Pleas Court dismissed Eley's second PCRA petition, and the Superior Court affirmed.

[9] Eley also claimed "[i]neffectiveness concerning after-discovered evidence."  Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody at 6, *Eley v. Erickson*, No. 3-08-cv-00090 (M.D. Pa. Jan. 14, 2008).  The District Court denied this challenge on the merits, and we rejected Eley's application for a certificate of appealability as to this issue.

Person in State Custody at 5-9, *Eley v. Erickson*, No. 3-08-cv-00090 (M.D. Pa. Jan. 14, 2008). The District Court, without holding a hearing, ordered the dismissal of the petition on the merits and declined to order the issuance of a certificate of appealability. Eley appealed. Determining that his claims were "adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citation omitted), we granted Eley's application for a certificate of appealability.

## II.

The District Court had jurisdiction over Eley's *habeas* petition pursuant to 28 U.S.C. §§ 2241 and 2254. We have jurisdiction over the District Court's order denying Eley's *habeas* petition pursuant to 28 U.S.C. §§ 1291 and 2253. Our review of the District Court's decision is plenary because no evidentiary hearing was held. *Lewis v. Horn*, 581 F.3d 92, 100 (3d Cir. 2009). Thus, we review the Superior Court's decision on direct appeal under "the same standard that the

11

District Court was required to apply," namely, AEDPA.[10]  *Id.*
(quotation omitted).

---

[10]  AEDPA governs our review of a state court's
adjudication "on the merits" of a *habeas* petitioner's claim.
28 U.S.C. § 2254(d).  Under AEDPA, we review the last state
court decision on the merits.  *Garrus v. Sec'y of the Pa. Dep't
of Corr.*, 694 F.3d 394, 400 n.4 (3d Cir. 2012) (*en banc*)
(citing *Greene v. Fisher*, 132 S. Ct. 38, 43-45 (2011)).
Unfortunately, neither Eley nor the Commonwealth has
explicitly addressed whether the Superior Court's decision on
direct appeal or the Superior Court's decision on PCRA
appeal was the last state court decision on the merits.

AEDPA imposes a "highly deferential standard for evaluating state-court rulings" on *habeas* review, which "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (quotations omitted). AEDPA's "difficult to meet" standard, *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011), establishes "a substantially higher threshold for obtaining relief than *de novo* review," *Renico*, 130 S. Ct. at 1862 (quotation omitted). Thus, AEDPA "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice

---

Nonetheless, by citing to the Superior Court's decision on direct appeal, Eley has implicitly identified the last state court decision on the merits. Appellant's Br. at 26 (citing App. at 261). We agree with Eley's suggestion. Eley presented his claims as substantive challenges on direct appeal and as ineffective assistance of counsel challenges on PCRA appeal, and "[o]ur practice is to entertain the merits of the claims advanced." *Thomas v. Horn*, 570 F.3d 105, 117 n.4 (3d Cir. 2009) (citation omitted). Further, the fact that the Superior Court on direct appeal decided these issues under state law does not preclude its determination from being on the merits under AEDPA. *See Priester v. Vaughn*, 382 F.3d 394, 398 (3d Cir. 2004) (recognizing that a state court decision may be on the merits under AEDPA even if it cites no United States Supreme Court precedent, "'so long as neither the reasoning nor the result of the state court decision contradicts'" clearly established federal law (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*))). Therefore, we will review the Superior Court's decision on direct appeal.

13

systems, not a substitute for ordinary error correction through appeal." *Harrington*, 131 S. Ct. at 786 (quotation omitted).

> AEDPA prohibits us from granting *habeas* relief
>
> "unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of [the United States Supreme] Court, [28 U.S.C.] § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)."

*Id.* at 785.

A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth" in Supreme Court precedent, *Williams*, 529 U.S. at 405, or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different" from that reached by the Supreme Court, *id.* at 406.

A state court decision is "an unreasonable application of" clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. We may not grant *habeas* relief merely because we believe that "the relevant state-court decision applied clearly established

14

federal law erroneously or incorrectly." *Renico*, 130 S. Ct. at 1862 (quotation omitted). "Rather, that application must be objectively unreasonable." *Id.* (quotation omitted). Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S. Ct. at 786 (citation omitted).

A state court decision is based on "an unreasonable determination of the facts" only if the state court's factual findings are "'objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Miller-El*, 537 U.S. at 340 (citing, *inter alia*, 28 U.S.C. § 2254(d)(2)). Moreover, the factual determinations of state trial and appellate courts are presumed to be correct. *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001). The petitioner bears the burden of "rebutting the presumption by 'clear and

15

convincing evidence.'"[11] *Rice v. Collins*, 546 U.S. 333, 339 (2006) (quoting 28 U.S.C. § 2254(e)(1)).

Our analysis under AEDPA follows a prescribed path. We must first "determine what arguments or theories supported or . . . could have supported, the state court's decision." *Harrington*, 131 S. Ct. at 786. We must next "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* We may, at

---

[11] The Supreme Court has "explicitly left open the question whether [28 U.S.C.] § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2)." *Wood v. Allen*, 130 S. Ct. 841, 849 (2010) (citation omitted). In the absence of Supreme Court guidance, we have explained that § 2254(e)(1) applies to a state court's subsidiary factual findings, and that a challenge under that section may be "based wholly or in part on evidence outside the state trial record." *Lambert v. Blackwell*, 387 F.3d 210, 235 (3d Cir. 2004) (citations omitted). We have also indicated that § 2254(d)(2) applies to a state court's ultimate factual findings, and that a challenge under that section is based on "the totality of the evidence presented in the state-court proceeding." *Id.* (quotation omitted). Thus, we have applied § 2254(e)(1) to challenges under § 2254(d)(2), but we have cautioned that "even if a state court's individual factual determinations are overturned [under § 2254(e)(1)], what factual findings remain to support the state court decision must still be weighed under the overarching standard" under § 2254(d)(2). *Id.* at 235-36.

16

last, grant *habeas* relief only if the petitioner demonstrates that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

Even if the petitioner is entitled to *habeas* relief under AEDPA, we will grant the writ only if the error was not harmless. Under the harmless error standard, we must "assess the prejudicial impact of [the] constitutional error in [the] state-court criminal trial." *Fry v. Pliler*, 551 U.S. 112, 121 (2007). We will hold the error harmless unless it led to "actual prejudice," in the form of a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quotation omitted).

## III.

### A.

Eley first claims that his Fourteenth Amendment due process right was violated when he was convicted of second-degree murder, robbery, and conspiracy to commit robbery based on insufficient evidence. Specifically, he contends that the Superior Court's rejection of his sufficiency of the evidence challenge was both contrary to and an unreasonable application of *Jackson* under 28 U.S.C. § 2254(d)(1), as well as an unreasonable determination of the facts under § 2254(d)(2). We agree with the District Court that Eley is not entitled to *habeas* relief on this issue.

17

1.

We begin with an analysis of this issue under 28 U.S.C. § 2254(d)(1). The clearly established federal law governing Eley's first claim was determined in *Jackson*, where the Supreme Court announced the constitutional minimum standard governing a challenge to the sufficiency of the evidence: a reviewing court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (citation omitted). Stated differently, a court reviewing the sufficiency of the evidence may overturn a conviction only "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."[12] *Id.* at 324.

a.

We first decide whether the Superior Court's adjudication of Eley's sufficiency of the evidence challenge

---

[12] The *Jackson* Court provided several definitions of "reasonable doubt." For example, a "mere modicum" of evidence cannot "by itself rationally support a conviction beyond a reasonable doubt." 443 U.S. at 320. Instead, reasonable doubt requires "a subjective state of near certitude of the guilt of the accused." *Id.* at 315 (citation omitted); *see also id.* at 317 n.9 ("A reasonable doubt has often been described as one based on reason which arises from the evidence or lack of evidence." (quotation omitted)).

18

was contrary to *Jackson*. The Superior Court described its standard of review as follows:

> "['W]hether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to find every element of the crime beyond a reasonable doubt.['] . . . *Commonwealth v. George*, 705 A.2d 916, 918 (Pa. Super. Ct. 1998). This Court may not reweigh the evidence and substitute its judgment for that of the factfinder. *Commonwealth v. Foster*, 764 A.2d 1076, 1082 (Pa. Super. Ct. 2000)."

App. at 259-60. We agree with the Superior Court's later conclusion on PCRA appeal that these rules do not contradict *Jackson*. *Id.* at 612 ("[T]he federal standard enunciated in *Jackson* is [not] any different from that employed in Pennsylvania when reviewing sufficiency of the evidence questions."). Nor does Eley argue that the facts of his case are materially indistinguishable from *Jackson*. Thus, we hold that the Superior Court's adjudication of Eley's sufficiency of the evidence claim was not contrary to *Jackson*.

b.

We next decide whether the Superior Court's adjudication of Eley's sufficiency of the evidence challenge was an unreasonable application of *Jackson*. We review the evidence with reference to "the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S.

19

at 324 n.16.   But we also recognize that "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (*per curiam*).

i.

We first address whether a rational jury could have found Eley guilty of conspiracy to commit robbery beyond a reasonable doubt.  In Pennsylvania, to convict a defendant of criminal conspiracy, the jury must find that:

> "(1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime."

*Commonwealth v. Johnson*, 985 A.2d 915, 920 (Pa. 2009) (quotation omitted).  Because it is hard to prove, the unlawful agreement "may be established inferentially by circumstantial evidence, i.e. the relations, conduct or circumstances of the parties or overt acts on the part of co-conspirators." *Commonwealth v. Spotz*, 716 A.2d 580, 592 (Pa. 1998) (citation omitted).

Separately, evidence of a defendant's association with the perpetrator of the crime, presence at the scene of the crime, or knowledge of the crime cannot establish an unlawful agreement, *Commonwealth v. Murphy*, 844 A.2d

20

1228, 1238 (Pa. 2004), but together, such evidence "may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail," *Commonwealth v. Devine*, 26 A.3d 1139, 1147 (Pa. Super. Ct. 2011) (quotation omitted). Similarly, evidence of flight may support an inference of an unlawful agreement, but only where "other evidence of guilt consists of more than mere presence at the scene." *Commonwealth v. Hargrave*, 745 A.2d 20, 23 (Pa. Super. Ct. 2000). Finally, evidence of a false statement may support an inference that it was "made with an intent to divert suspicion or to mislead the police or other authorities, or to establish an alibi or innocence." *Commonwealth v. Kravitz*, 161 A.2d 861, 870 (Pa. 1960) (quotation omitted).

The Superior Court found that the evidence showed that Eley, Eiland, and Mitchell "were seen together near the scene of the crime by several individuals prior to the time of the incident. They were seen acting together when the victim was shot. The shooter exited the cab and joined the other two men. All three fled the scene together." App. at 261. Based on this evidence, the Superior Court concluded that the "jury could infer . . . that [Eley] and his co-defendants had conspired together to attack and rob the victim, and that the shooting of the victim and the entry into the cab were acts in furtherance of their plan." *Id.* Thus, according to the Superior Court, the evidence was sufficient to support Eley's conspiracy to commit robbery conviction.

Eley takes issue with the Superior Court's finding that he "'acted together' with his co-defendants during the crime." Appellant's Br. at 24-25. He argues that, at most, the

21

evidence showed only that he was present at and fled from the scene of the crime. He also asserts that there was no evidence linking him to the abandoned house or the weapons found therein. For this reason, Eley maintains that there was "no evidence that [he] had agreed to take part in a robbery." *Id.* at 20.

Eley analogizes his case to our decision in *Johnson v. Mechling*, 446 F. App'x 531 (3d Cir. 2011). There, the prisoner appealed the district court's denial of his *habeas* petition, challenging the sufficiency of the evidence supporting his convictions for first-degree murder as an accomplice and for conspiracy to commit murder. In rejecting the prisoner's claim, the Superior Court had relied on the following evidence: on the night of the murder, the prisoner, his co-defendant, and the victim were kicked out of a bar after an argument; when they left the bar, the victim was walked between the prisoner and his co-defendant; when the group arrived at an alley, there was a gunshot; after the gunshot, two people fled from the alley; and later, the victim's body and the murder weapon were discovered in the alley. In reviewing the Superior Court's decision, we held that "such evidence does not permit any reasonable fact finder to reasonably infer . . . specific intent to kill." *Id.* at 540. Accordingly, we reversed and remanded for the District Court to issue the writ.

Unfortunately for Eley, after he filed his brief, the Supreme Court in *Coleman* summarily reversed our decision in *Johnson*. In *Coleman*, the Court first admonished us for "imping[ing] on the jury's role as factfinder" through "fine-grained factual parsing," and reminded us that "*Jackson*

22

leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial." 132 S. Ct. at 2064. The Court then summarized additional relevant evidence: the prisoner and his co-defendant were close friends; on the day of the murder, the prisoner heard his co-defendant repeatedly proclaim that he was going to kill the victim; right before the murder, the co-defendant was noticeably concealing a weapon in the prisoner's presence; the prisoner helped his co-defendant escort the victim to the alley; and the prisoner stood at the entrance of the alley while his co-defendant killed the victim in the alley. Based on this evidence, the Court concluded that a rational jury could have inferred that the prisoner: (1) "knew that [his co-defendant] was armed with a shotgun;" (2) "knew that [his co-defendant] intended to kill [the victim];" (3) "helped usher [the victim] into the alleyway to meet his fate;" and (4) "may have been prepared to prevent [the victim] from fleeing." *Id.* at 2065. Therefore, the Court held that the evidence "was not *nearly* sparse enough to sustain a due process challenge under *Jackson*." *Id.* (emphasis added).

Although the evidence is less compelling in this case than in *Coleman*, a rational jury could have made the same inferences in both cases. Here, there was testimony that Eley and his co-defendants would hang out in the area near the abandoned house every day; that they were hanging out in the area of the abandoned house before the crime; that they ran fast together away from the taxi and towards the abandoned house after the crime; and that two firearms and three shotguns were recovered from the abandoned house during the investigation. From this evidence, a jury could have

23

rationally inferred that Eley was close friends with his co-defendants; that they had a weapons stash in the abandoned house; that they picked up weapons from the abandoned house before the crime; and that they dropped off weapons at the abandoned house after the crime. Thus, a rational jury could have inferred that Eley knew that one of his co-defendants was armed.

Additionally, witnesses testified that Eley and his co-defendants were hanging out in the area of Hummel and Kittatinny before the crime; that during the crime, three black men were by the taxi, and that no one else was in the general area; that one of the three men entered the taxi and two shots were fired; that the other two men, instead of running away, waited for the first man right beside the taxi; that the first man exited the taxi and rejoined the other two men, and that another shot was fired while all three men were together by the side of the taxi; and that after the crime, Eley and his co-defendants ran fast away from the taxi towards the abandoned house. From this evidence, a jury could have rationally inferred that Eley and his co-defendants approached the taxi together; that Eley waited right beside the taxi while one of his co-defendants entered the cab and shot DeJesus twice; that Eley remained next to one of his co-defendants when he exited the taxi and shot DeJesus a third time; and that Eley fled with his co-defendants. A rational jury could have thus inferred that Eley knew that one of his co-defendants intended to rob DeJesus.

Finally, a jury could have rationally inferred that Eley intended and agreed to rob DeJesus with his co-defendants. From the testimony that two men waited right beside the taxi

24

while one man entered and two shots were fired, a rational jury could have inferred that Eley was "prepared to prevent [DeJesus] from fleeing." *Coleman*, 132 S. Ct. at 2065. Further, from the testimony that Eley fled with his co-defendants towards the abandoned house where multiple weapons were found, a rational jury could have inferred that Eley was ready to help one of his co-defendants hide the murder weapon. Finally, from the testimony that Eley made a false statement to the police during the investigation, a rational jury could have inferred that Eley was attempting to hide his guilt.

Undeniably, in this case we are "faced with a record of historical facts that supports conflicting inferences." *Jackson*, 443 U.S. at 326. For example, from the fact that Eley and his co-defendants were loitering in the area of Hummel and Kittatinny before the crime plus the fact that they regularly hung out there, a rational jury could have inferred that they were standing around innocently. However, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* Returning to the previous example then, from the fact that Eley and his co-defendants were hanging out in the area of Hummel and Kittatinny before the crime plus the fact that the abandoned house – to which they fled and at which multiple weapons were found – was nearby, we must presume that the jury actually inferred that they were plotting to rob DeJesus. Thus, the evidence was sufficient to support Eley's conviction for conspiracy to commit robbery.

25

ii.

We next address whether a rational jury could have found Eley guilty of robbery beyond a reasonable doubt. In Pennsylvania, a defendant is guilty of robbery "if, in the course of committing a theft, he . . . physically takes or removes property from the person of another by force however slight." 18 Pa. Cons. Stat. § 3701(a)(1)(v). A defendant is, in turn, guilty of theft "if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." § 3921(a). Because Eley was guilty of conspiracy, he could be guilty of robbery if either he or one of his co-defendants committed robbery in furtherance of their conspiracy. *Murphy*, 844 A.2d at 1238 ("[A conspirator] may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act." (citation omitted)).

The Superior Court found that the evidence "indicated that [Eley] and his co-defendants confronted the victim with a gun and shot him three times. One of the attackers entered the cab. When the police arrived, the victim's money was missing. No one else was seen entering the cab before the arrival of the police." App. at 261-62. "While this evidence

26

was circumstantial,"[13] the Superior Court concluded that it "was sufficient to convict [Eley] of robbery." *Id.* at 262.

Eley argues that there was "no evidence that [he] was part of a robbery." Appellant's Br. at 20. But because Eley conspired to commit robbery, the Commonwealth was not required to prove that he participated in the robbery, only that one of his co-conspirators did so. *Murphy*, 844 A.2d at 1238. Eley also asserts that "there was no evidence that [he] benefited in any way from the robbery, such as possession of money." Appellant's Br. at 25. However, such evidence is unnecessary to support his conviction because "proof of an attempted theft is sufficient to establish the 'in the course of committing a theft' element of robbery." *Commonwealth v. Sanchez*, 36 A.3d 24, 42 (Pa. 2011) (quoting 18 Pa. Cons. Stat. § 3701(a)(1)-(2)).

At trial, there was testimony that DeJesus possessed $250.00 before the crime; that he always kept his money in a pouch in his taxi while he was working; that Eley and his co-defendants were hanging out in the area of Hummel and Kittatinny before the crime; that during the crime, three black men were by the taxi and no one else was in the general area;

---

[13] Eley argues that the evidence was too circumstantial to sustain a judgment under *Jackson*. But it is well established that the Commonwealth "may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. Ct. 2009) (quotation omitted).

that one of the men then entered the taxi and two shots were fired; that Eley and his co-defendants fled from the taxi after the crime; and that neither DeJesus's cash nor his pouch was found on his person or in his taxi during the investigation. From this evidence, a rational jury could have inferred that Eley or one of his co-defendants physically took DeJesus's cash by force with the intent to deprive him thereof. Thus, there was sufficient evidence supporting Eley's conviction for robbery.

iii.

We finally address whether a rational jury could have found Eley guilty of second-degree murder beyond a reasonable doubt. In Pennsylvania, "[m]urder of the second degree is a criminal homicide committed while a defendant was engaged as a principal or an accomplice in the perpetration of a felony." *Commonwealth v. Lambert*, 795 A.2d 1010, 1022 (Pa. Super. Ct. 2002) (*en banc*) (citing 18 Pa. Cons. Stat. § 2502(b)). Further, "perpetration of a felony" includes the commission or the attempted commission of a robbery as a principal or as an accomplice, 18 Pa. Cons. Stat. § 2502(d), and "criminal homicide" means "intentionally, knowingly, recklessly or negligently caus[ing] the death of another human being," § 2501(a). Finally, the "intent to commit the underlying crime is imputed to the killing to make it second-degree murder." *Lambert*, 795 A.2d at 1022 (citing, *inter alia*, *Commonwealth v. Mikell*, 729 A.2d 566, 569 (Pa. 1999)). Again, Eley could be guilty of second-degree murder if either he or one of his co-defendants committed second-degree murder in furtherance of their conspiracy. *Murphy*, 844 A.2d at 1238.

28

The Superior Court found that DeJesus "was killed by three shots fired by [Eley] or a co-defendant while they were committing the felony of robbery." App. at 262. For this reason, the Superior Court concluded that the evidence "was sufficient to convict [Eley] of second-degree murder." *Id.*

A review of the testimony reveals that DeJesus possessed $250.00 before the crime; that he always kept his money in a pouch in his taxi while he was working; that Eley and his co-defendants were hanging out in the area of Hummel and Kittatinny before the crime; that during the crime, three black men were by the taxi and no one else was in the general area; that one of the three men entered the taxi and two shots were fired; that the first man exited the taxi and rejoined the other two men by the side of the taxi and a third shot was fired; that Eley and his co-defendants fled from the taxi after the crime; that neither DeJesus's cash nor his pouch was found on his person or in his taxi during the investigation; and that DeJesus later died from three gunshot wounds to his head and neck. A rational jury could have inferred from this evidence that Eley or one of his co-defendants killed DeJesus while robbing him. Thus, Eley's

29

conviction for second-degree murder was supported by sufficient evidence.[14]

---

[14] The Superior Court did not analyze Eley's challenge to the sufficiency of the evidence under an accomplice theory of liability. Nonetheless, we note that even if no rational jury could have found Eley guilty of conspiracy to commit robbery beyond a reasonable doubt, the evidence was sufficient to support his convictions for second-degree murder and robbery as an accomplice. Because Eley was re-sentenced to a term of life imprisonment without parole for his second-degree murder and robbery convictions, reversing his conviction for conspiracy to commit robbery would provide little relief.

Under Pennsylvania law, the difference between conspiracy and accomplice liability is that accomplice liability, unlike conspiracy liability, does not require proof of an unlawful agreement. *Commonwealth v. Murphy*, 844 A.2d 1228, 1238 (Pa. 2004). Thus, accomplice liability only requires proof of two elements: (1) "that the defendant intended to aid or promote the underlying offense;" and (2) "that the defendant actively participated in the crime by soliciting, aiding, or agreeing to aid the principal." *Id.* at 1234 (citation omitted). "Both requirements may be established wholly by circumstantial evidence." *Commonwealth v. Kimbrough*, 872 A.2d 1244, 1251 (Pa. Super. Ct. 2005) (*en banc*) (citing *Murphy*, 844 A.2d at 1234). While "a defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene," *Murphy*, 844 A.2d at 1234 (citation omitted), "the least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice," *Kimbrough*, 872 A.2d at 1251 (quoting *Commonwealth v. Coccioletti*, 425 A.2d 387, 390 (Pa. 1981)).

31

We acknowledge that under *Jackson* – which allows us to "set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury" – this is a close case. *Coleman*, 132 S. Ct. at 2062 (quotation omitted). But in addition to the first layer of deference we owe to the jury under *Jackson*, we owe a second layer of deference to the Superior Court under AEDPA. *Id.*; *see also Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (*per curiam*) ("[A] federal court may . . . overturn a state court decision rejecting a sufficiency of the evidence challenge . . . only if the state court decision was 'objectively unreasonable.'" (citation omitted)). Had we been the jury, we might have acquitted Eley; had we been the Superior Court, we might even have reversed his conviction. But applying our doubly deferential standard of review, we simply cannot conclude that it was objectively unreasonable for the Superior Court to decide that a rational jury could have found Eley guilty of second-degree murder, robbery, and conspiracy to commit robbery beyond a reasonable doubt. *See Cavazos*, 132 S. Ct. at 4 (recognizing that "the inevitable consequence" of this

---

Without belaboring the point, a rational jury could have inferred that Eley intended to aid and actively participated in the crimes by standing right beside the taxi to prevent DeJesus from fleeing while one of his co-defendants was inside the cab and by fleeing with his co-defendants to the abandoned house to hide their weapons. Therefore, in the alternative, the evidence was sufficient to support Eley's convictions for second-degree murder and robbery as an accomplice.

32

double deference "is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold").

2.

Having rejected Eley's claim under 28 U.S.C. § 2254(d)(1), we conclude with an analysis of this issue under § 2254(d)(2).[15] Eley contends that the determination that he agreed with Eiland and Mitchell to rob DeJesus was based on an unreasonable finding that he "act[ed] together" with his co-defendants. Appellant's Br. at 26. We have recounted that there was testimony that Eley waited right beside the taxi while one of his co-defendants entered the cab and fired two shots; that instead of immediately fleeing, he waited for his co-defendant to exit the cab and rejoin him by the side of taxi and fire another shot; that he fled with his co-defendants from the taxi towards the abandoned house, and that two firearms and three shotguns were recovered from the abandoned house during the investigation. Although this evidence could have been interpreted as "mere presence and flight," *id.*, that

---

[15] We note that one Court of Appeals has held that 28 U.S.C. § 2254(d)(2) "is not readily applicable to *Jackson* cases." *Sarausad v. Porter*, 479 F.3d 671, 677 (9th Cir. 2007), *rev'd on other grounds sub nom. Waddington v. Sarausad*, 555 U.S. 179 (2009); *but see O'Laughlin v. O'Brien*, 568 F.3d 287, 298 n.14 (1st Cir. 2009) (declining to adopt the *Sarausad* analysis). We will assume that § 2254(d)(2) is applicable to *Jackson* cases and decide Eley's claim on the merits.

33

alternative interpretation "does not—by itself—rise to the level of clear and convincing evidence," necessary for Eley to rebut the presumptive correctness attached to the Superior Court's factual finding under § 2254(e)(1). *Rountree v. Balicki*, 640 F.3d 530, 543 (3d Cir. 2011) (quotation omitted).

We have also described testimony that Eley was close friends with his co-defendants; that he left the abandoned house and approached the taxi with his co-defendants; and that a cache of weapons was later recovered from the abandoned house. From this evidence, plus the fact that Eley acted together with his co-defendants during the crimes, we hold that the Superior Court's determination that he agreed with Eiland and Mitchell to rob DeJesus was not objectively unreasonable under § 2254(d)(2). *See Wood v. Allen*, 130 S. Ct. 841, 850-51 (2010) (holding, under § 2254(d)(2), that even if the state court's decision was debatable, it was not based on an unreasonable determination of the facts in light of the evidence). Therefore, we will affirm the District Court's denial of Eley's first claim.

B.

Eley next claims that his Sixth Amendment confrontation right was violated when his non-testifying co-defendants' confessions were admitted against him at their joint trial. Specifically, he contends that the Superior Court's rejection of his challenge to the trial judge's denial of his motion to sever was contrary to or an unreasonable application of *Bruton*, *Richardson*, and *Gray*. On this issue,

34

we part ways with the District Court and conclude that Eley is entitled to *habeas* relief.[16]

## 1.

Before analyzing Eley's claim, we present the relevant confession testimony and jury instructions. At Eley's joint trial, the Commonwealth introduced into evidence two extrajudicial statements by Eiland and one extrajudicial statement by Mitchell, neither of whom testified. The Commonwealth first called Matthew LeVan, who was incarcerated with Eiland at the Dauphin County Prison in July

---

[16] To be fair, we note that the District Court analyzed this issue as a claim that Eley's "counsel provided ineffective assistance . . . by not objecting to the admission of statements made by co-defendants," App. at 13, since Eley framed this issue as an ineffective assistance of counsel claim in his *pro se* memorandum of law in support of his *pro se habeas* petition, Petitioner's Memorandum of Law in Support of His Previously Filed Petition for Writ of *Habeas Corpus* and Addressing the Anti-Terrorism and Effective Death Penalty Act at 31-41, *Eley v. Erickson*, No. 3-08-cv-00090 (M.D. Pa. Jan. 14, 2008). However, we granted the certificate of appealability in this case "as to Claim[] . . . 4 in [Eley's] habeas petition," App. at 3, which presents a *Bruton* claim, Petition at 9. Additionally, the parties have briefed this issue as a *Bruton* claim. Appellant's Br. at 35-42; Appellee's Br. at 19-21. Accordingly, we will analyze this issue as a *Bruton* claim rather than as an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984).

35

2000. The prosecutor began by asking LeVan if Eiland was "in the courtroom." App. at 136. After LeVan responded in the affirmative, the prosecutor then requested that LeVan identify Eiland, inquiring: "Of the three Defendants, which—is he farthest? Middle? Closest?" *Id.* at 136-37. LeVan selected Eiland as the closest of the three defendants at the counsel table. Moments later, LeVan testified that Eiland confessed to him that:

> "[T]hey—they, as in whoever was with him—he didn't say the names of those people—when he went up to them, it was supposed to be a robbery, and he was—he's the one that shot him, but he didn't mean to do it. It was the other two's idea or something like that, in that sense."[17]

*Id.* at 138. No limiting instruction accompanied LeVan's testimony.

---

[17] LeVan's testimony that "[Eiland] didn't say the names of those people" arguably implies that the confession was not redacted. App. at 138. However, the Commonwealth admits that "the trial court ordered that the statements by Eley's co-defendants, Eiland and Mitchell, be redacted so that they did not refer to any other person than the speaker." Appellee's Br. at 20. Moreover, the Superior Court found that "the trial court ordered that the statements by Eiland and Mitchell be redacted so that they did not refer to [Eley]," App. at 263, and we must presume that this factual determination was correct, 28 U.S.C. § 2254(e)(1).

The Commonwealth next called Steven Taylor, who was Eiland's cellmate at the Dauphin County Prison in July 2000. According to Taylor, Eiland confessed to him that "they were there to rob a cabdriver, and I guess with different things you [*sic*] did or whatnot during the evening, somewhere, somehow, something went wrong and whatnot. Somebody ended up dead from that." *Id.* at 152. Again, the trial judge gave no limiting instruction for Taylor's testimony.

The Commonwealth finally called Kevin Duffin, a Harrisburg Police Bureau detective, who took Mitchell's written statement in July 2000. According to Duffin, Mitchell confessed to him:

> "[B]etween 12 and, I think, 1, 1:30 in the morning, July 5th, that he was at the corner of Kittatinny and Elm Street . . . [f]iring weapons into the air [with two other people]. . . . They took [the three firearms and two shotguns] to a house on Hummel Street before they placed one of the shotguns under a mattress and took one to the second floor. But pretty much they hid the weapons; loaded them and hid them in the house."

*Id.* at 161. Immediately after Duffin's testimony, the trial judge instructed the jury:

> "Now, the reference by Mr. Mitchell to 'they,' the pronoun 'they,' we have, as you see here, three Defendants on trial. But I instruct you that you may not draw any assumption or

37

conclusion from this testimony of the officer that Edward Mitchell was speaking about the other two Defendants in this case.

When Edward Mitchell speaks, he speaks for himself in other words. So anything that the officer is saying about it or Mitchell should be limited to Edward Mitchell and not to the other two Defendants in this case."

*Id.* at 163.

During the jury charge, the trial judge gave two more limiting instructions. The jury was first instructed:

"Earlier in the trial you heard me give you an instruction regarding a statement—several statements—that were made by one or more of the Defendants, and I want to repeat that instruction to you now. This involves any statement by an individual to the police.

That statement can only be used against the person speaking. It cannot be used against anyone else. There is a rule which restricts use by you of the evidence offered to show that the Defendants, Eiland and Mitchell, made statements concerning the crime charged.

A statement made before trial may be conferred as evidence only against the Defendant who made that statement. Thus, you may consider

38

the statement evidence against Eiland and Mitchell if you believe they made the statement voluntarily. You must not, however, consider the statement as evidence against the statement of [*sic*] Karim. You must not use the statements in any way against them [*sic*]."

*Id.* at 193. And the trial judge later instructed:

"Oh, there was one other point I was supposed to give you and I neglected. Again, in giving the example of felony murder and whether a robbery did occur here, and I said one of the examples of direct evidence of that was the statement of one of the Defendants.

Once again, as I told you, I think before, that statement by that Defendant who indicated, if you believe that he did make the statement and you believe it to be true, if the purpose was robbery, that can only be held against that person who made the statement and no one else."

*Id.* at 200.

2.

Our summary of the relevant confession testimony and jury instructions complete, we next review *Bruton*, *Richardson*, and *Gray*, which "establish the controlling precedent for [Eley's claim] for purposes of 28 U.S.C.

39

§ 2254(d)(1)." *Vazquez v. Wilson*, 550 F.3d 270, 279 (3d Cir. 2008).  The Supreme Court first decided *Bruton*, where a defendant and his co-defendant were jointly tried for robbery. The non-testifying co-defendant's unredacted confession that "[he] and petitioner committed the armed robbery" was admitted.  391 U.S. at 124.  At the close of the Government's case, the jury was instructed that the confession could not be considered as evidence against the defendant.

The *Bruton* Court held that a defendant's Sixth Amendment confrontation right is violated when a non-testifying co-defendant's extrajudicial statement inculpating the defendant is introduced at a joint trial, even if a jury is instructed that the confession may be considered as evidence only against the declarant.  The Court reasoned that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135 (citations omitted).  The Court concluded that "[s]uch a context is presented . . . where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," *id.* at 135-36, and thus, that the defendant's Sixth Amendment confrontation right is violated in this situation, regardless of whether the jury receives an appropriate limiting instruction.

The Court revisited *Bruton* in *Richardson*, where two of three alleged perpetrators were jointly tried for murder. The non-testifying co-defendant's confession "was redacted to omit all reference to [the defendant]" and "all indication

40

that *anyone* other than [the declarant] and [a third-party] participated in the crime." 481 U.S. at 203. As redacted, the confession only revealed that the declarant and the third-party planned the murder during a car ride to the victim's house. But the defendant herself later testified that she had been along for the ride. After the confession was admitted and after closing arguments, the jury was instructed that the confession could not be used against the defendant.

Limiting *Bruton*, the *Richardson* Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to . . . her existence." *Id.* at 211. The Court explained that the confession at issue "was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *Id.* at 208. The *Richardson* Court distinguished the confession that "expressly implicated" the defendant in *Bruton* from the confession that "contextually implicated" the defendant in that case, reasoning that because "testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind," jury instructions are ineffective against *Bruton*-type confessions, but effective against *Richardson*-type confessions. *Id.*

The Court again returned to *Bruton* in *Gray*, where a defendant and his co-defendant were jointly tried for murder. The non-testifying co-defendant had confessed that he, the defendant, a third-party, "and a few other guys" were "in the group that beat" the victim to death. 523 U.S. at 196. This

41

confession was redacted by substituting "a kind of symbol, namely, the word 'deleted' or a blank space set off by commas" for the names of the defendant and the third-party. *Id.* at 192. After closing arguments, the jury was instructed that it should not use the confession against the defendant.

The *Gray* Court held that "as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results." *Id.* at 195. The Court arrived at this holding despite acknowledging that "in some instances the person to whom the blank refers may not be clear," *id.* at 194, such as in a case where a confession "uses two (or more) blanks, even though only one other defendant appears at trial, and in which the trial indicates that there are more participants than the confession has named," *id.* at 195. In so holding, the *Gray* Court expanded *Bruton*, concluding that a confession redacted in this way is "directly accusatory," *id.* at 194, because it "facially incriminat[es]" the defendant, *id.* at 196 (quotation and emphasis omitted).

The *Gray* Court's holding also limited *Richardson*. The *Gray* Court reasoned that although *Richardson* seemed to exempt all inferentially incriminatory confessions from the *Bruton* rule, the *Richardson* rule actually depended "in significant part upon the *kind* of, not the simple *fact* of, inference." *Id.* The Court elaborated: "*Richardson*'s inferences involved statements that did not refer directly to the defendant himself and which became incriminating only when linked with evidence introduced later at trial." *Id.* (quotation omitted). In contrast, *Gray*'s inferences involved

42

"statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.*

3.

Having presented the applicable clearly established federal law, we first analyze whether the Superior Court's decision affirming the trial judge's denial of Eley's motion to sever was contrary to *Bruton*, *Richardson*, and *Gray*. The Superior Court described the law as follows:

> "Admission of [an inculpatory statement by a co-defendant implicating the defendant] violates a defendant's Sixth Amendment right to cross-examine the witnesses against him. Courts have addressed this problem by redacting confessions of non-testifying co-defendants to remove references implicating the defendant. . . . However, the Sixth Amendment is only violated where the implication arises from the face of the redacted statements and not from linkage to other evidence."

App. at 263-64 (citation omitted). We conclude, like the Superior Court on PCRA appeal, that these rules do not contradict the clearly established federal law in *Bruton* and its progeny. *Id.* at 617 ("[Eley] fails to persuade us that, had trial counsel argued that the redaction was insufficient in accordance with federal cases including *Bruton* [and its

43

progeny], the outcome would have been different.")  Again, Eley does not argue that the facts of his case are materially indistinguishable from the facts in *Bruton* and its progeny. Thus, we hold that the Superior Court's decision was not contrary to *Bruton* and its progeny.

4.

We next analyze whether the Superior Court's decision upholding the trial judge's rejection of Eley's severance request was an unreasonable application of *Bruton*, *Richardson*, and *Gray*. Although Eley takes exception to all three of the extrajudicial statements of his non-testifying co-defendants admitted at their joint trial, our discussion focuses on LeVan's testimony that Eiland confessed that "he's the one that shot him," but that "[i]t was the other two's idea." App. at 138. Because we conclude that the Superior Court's adjudication of Eley's claim with respect to this confession was an unreasonable application of clearly established federal law under *Bruton* and its progeny, we need not decide whether Taylor's testimony that Eiland confessed that "they were there to rob a cabdriver," *id.* at 152, or Duffin's testimony that Mitchell stated that he was firing weapons around the time and near the vicinity of the crimes "with two other people," *id.* at 161, constituted additional *Bruton* violations.

Eley argues that the admission of Eiland's confession was error because it "referred to [his] existence." Appellant's Br. at 37. Specifically, Eley asserts that *Gray* controls because Eiland's confession "made clear that three men (the precise number in the courtroom) participated in the

44

crime[s]." *Id.* at 41. Thus, Eley claims that he was "directly implicated" in the crimes. *Id.* at 42. The Commonwealth counters that the confession was redacted so that it "did not refer to any other person than the speaker," and that Eley's contention regarding the reference in the confession to the number of participants in the crimes "is a clear attempt at contextual implication" governed by *Richardson*.[18] Appellee's Br. at 20.

The Superior Court first found that "the trial court ordered that statement[] by Eiland . . . be redacted so that [it]

_____

[18] The Commonwealth also argues, in the alternative, that Eiland's confession made "no . . . contextual implication of Eley" because it did not refer to Eley's involvement in the crimes. Appellee's Br. at 21. For this reason, according to the Commonwealth, *Richardson* is inapplicable and limiting instructions were not required. The Commonwealth misunderstands the nature of contextual implication, which may occur even if a non-testifying co-defendant's confession is redacted so that it does not reference a defendant's name or his participation in a crime. The confession in *Richardson* was redacted in this way, and the Supreme Court nonetheless found that the confession contextually implicated the defendant "when linked with evidence introduced later at trial." 481 U.S. at 208. The *Richardson* Court went on to hold that the Confrontation Clause of the Sixth Amendment was not violated by the confession's introduction into evidence so long as it was accompanied by a proper limiting instruction. *Id.* at 211. In any event, we believe that Eiland's confession expressly implicated Eley. *See infra* Part III.B.4.

45

did not refer to [Eley]," App. at 263, and that, as redacted, that statement only indicated that "[Eiland] had pulled the trigger," *id.* at 264. The Superior Court then concluded that "[n]one of the statements by Eiland or Mitchell that were presented to the jury referred to [Eley] or directly implicated him in any way," *id.* at 264-65, and that "[t]he trial court properly instructed the jury that such statements were to be used as evidence against only the individual who made the statement," *id.* at 264. Thus, according to the Superior Court, the trial judge did not err in denying Eley's motion to sever his trial from that of his co-defendants.

The Superior Court's reliance on the trial judge's jury instructions reveals that it believed that *Richardson* governed Eley's case. But *Richardson* does not support the Superior Court's conclusion that Eiland's confession did not refer to Eley. *Richardson*'s holding is explicitly limited to a confession that is redacted to eliminate "not only the defendant's name, *but any reference to his . . . existence.*" 481 U.S. at 211 (emphasis added). Here, Eiland's confession was redacted to omit any reference to Eley's name. However, Eiland's statement that "he's the one that shot him," but that "[i]t was the other two's idea" expressly referred to the existence of exactly three people: himself and two others. App. at 138. Eiland's express reference to the existence of Eley and Mitchell as "the other two," *id.*, could not have been lost on the jury because, as the Commonwealth emphasized shortly before introducing the confession into evidence, there were exactly "three Defendants" sitting at the defense table "in the courtroom," *id.* at 136.

46

*Gray*, moreover, contradicts the Superior Court's conclusion that Eiland's confession did not directly implicate Eley. *Gray*'s holding explicitly extends to a confession that is redacted to "replace a proper name with . . . a symbol," 523 U.S. at 195, which "facially incriminat[es]" a defendant, *id.* at 196 (quotation and emphasis omitted). Here, the Commonwealth merely replaced Eley and Mitchell's names in Eiland's confession with a type of symbol—the number two. Further, all three defendants were charged together and jointly tried under conspiracy, accomplice, and principal theories of liability. For this reason, Eiland's confession that "he's the one that shot him" directly implicated himself as a principal, and his statement that "[i]t was the other two's idea" directly implicated both Eley and Mitchell as his co-conspirators and accomplices. App. at 138.

Although we are mindful of the deference that we owe to the Commonwealth's courts, we are constrained to conclude that fairminded jurists could not disagree that the Superior Court's decision is inconsistent with *Richardson* and *Gray*. We have no doubt that the jury inferred, on the basis of Eiland's confession alone, that Eley was one of "the other two" whose "idea" it was to rob DeJesus. App. at 138. As in *Gray*, "[t]he inferences at issue here involve[d] statements that, despite redaction, obviously refer[red] directly to someone . . . and which involve[d] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." 523 U.S. at 196. Indeed, a juror who wondered to whom "the other two" referred, App. at 138, "need[ed] only lift his eyes to [Eley and Mitchell], sitting at counsel table, to find what . . . seem[ed]

47

the obvious answer," *Gray*, 523 U.S. at 193. Therefore, we hold that the Superior Court's affirmance of the trial judge's denial of Eley's motion to sever was an unreasonable application of *Bruton* and its progeny.[19]

---

[19] Although we conclude that Eley's case is controlled by *Gray v. Maryland*, 523 U.S. 185 (1998), we pause to point out that we would likely reach the same conclusion even if it were governed by *Richardson v. Marsh*, 481 U.S. 200 (1987). Eley argues that the limiting instruction was "woefully inadequate" because it was only offered after and only applied to Duffin's testimony about Mitchell's confession. Appellant's Br. at 42. The Commonwealth disagrees and asserts that *Richardson* was satisfied because the trial judge "charged the jury on at least three occasions that any statement by a defendant was to be used as evidence against that defendant only," and "[s]pecifically . . . instructed the jury not to use the statements against Eley." Appellee's Br. at 20. The Superior Court, in turn, denied Eley's appeal because "[t]he trial court properly instructed the jury that [the] statements were to be used as evidence against only the individual who made the statement." App. at 264.

Here, the trial judge likely violated *Richardson* by failing to instruct the jury contemporaneously with the admission of Eiland's confession. *Richardson* held that the admission of a non-testifying co-defendant's confession that contextually implicates a defendant is permissible only if it is accompanied by a "proper limiting instruction." 481 U.S. at 211. In *Delli Paoli v. United States*, the Supreme Court defined an "appropriate instruction" as one that is made "at the time of the admission" and that "make[s] it clear that the evidence is limited as against the declarant only." 352 U.S. 232, 238 (1957) (emphasis omitted), *overruled on other grounds by Bruton*, 391 U.S. at 126. Although *Bruton* overruled *Delli Paoli*'s holding that a limiting instruction is sufficient to protect a defendant's Sixth Amendment confrontation right when his non-testifying co-defendant's confession expressly implicating him is admitted at their joint trial, *Richardson* demonstrates that *Delli Paoli*'s definition of an appropriate limiting instruction survives in non-*Bruton* contexts. Moreover, a compelling case could certainly be made that the instructions that the trial judge later provided were incorrectly limited to "any statement by an individual to the police," App. at 193, and thus insufficient to "dissuad[e] the jury from entering onto the path of inference in the first place," *Richardson*, 481 U.S. at 208. Therefore, if Eley's case were not controlled by *Gray*, the Superior Court's affirmance of the trial judge's denial of Eley's motion to sever would likely be an unreasonable application of *Richardson*.

49

We had occasion to address a scenario similar to this one in *Vazquez*, 550 F.3d 270.[20] *Vazquez* concerned the joint trial of a defendant and his co-defendant for murder. Prior to trial, the non-testifying co-defendant told police that the defendant "was the shooter and that he and [a third-party] were surprised when [the defendant] opened fire." *Id.* at 273. At trial, the declarant's statement was redacted by replacing the names of the defendant and the third-party with the neutral terms "my boy" and "the other guy." *Id.* at 274. After closing arguments, the jury was instructed that it could not consider the confession as evidence against the defendant.

On *habeas* review, we recognized that "ordinarily the use of a term like 'the other guy' will satisfy *Bruton*." *Id.* at 282. However, we reasoned that the redacted confession indicated there were only two possible shooters: "my boy" and "the other guy." *Id.* at 281. We determined that it was highly probable that the jury would believe that the declarant was referring to the defendant as the shooter because the third-party was not on trial, and the Commonwealth argued that the defendant was the shooter. Thus, we granted *habeas*

---

[20] We recognize that under AEDPA, "court of appeals precedent is irrelevant to the ultimate issue," because "we are obliged to ascertain whether the state court decision being examined was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Vazquez v. Wilson*, 550 F.3d 270, 282 (3d Cir. 2008) (quotations omitted). Thus, as evidenced by our analysis, our holding does not depend on *Vazquez*.

relief, concluding that if that case did not involve an unreasonable application of clearly established federal law under *Bruton* and its progeny, "it [would be] difficult to conceive of any case that could meet that admittedly exacting standard." *Id.*

Eley presents an even more compelling case for *habeas* relief than *Vazquez.* In *Vazquez*, the jury had to decide whether the declarant's statement, which implicated a single shooter in the murder, referred to the defendant or the absent third-party. In other words, *Vazquez* presented the unclear case, foreshadowed by *Gray,* where "a confession . . . uses two . . . blanks, even though only one other defendant appears at trial." 523 U.S. at 195. Here, the jury was not required to make a comparable choice; Eiland's confession expressly implicated exactly three people in the crimes and exactly three defendants appeared at the joint trial. If the defendant in *Vazquez* merited *habeas* relief, it is difficult to conceive of any reason that Eley is unworthy of such relief.

*Vazquez* is analogous for another reason. In *Vazquez*, the Superior Court affirmed the Common Pleas Court's admission of the confession by relying heavily on the Pennsylvania Supreme Court's decision in *Commonwealth v. Travers*, 768 A.2d 845 (Pa. 2001). On *habeas* review, we indicated that while we were cognizant of the respect that we owed to the Commonwealth's courts, "we [were] compelled to recognize" that the Supreme Court in *Travers* and its progeny "came close to endorsing a bright-line rule that when terms like 'my boy,' the 'other guy,' or the 'other man' are used to substitute for an actual name . . . there cannot be a

51

*Bruton* violation."[21]  *Vazquez*, 550 F.3d at 281.  We concluded that the adoption of such a bright-line rule was an unreasonable application of clearly established federal law under *Bruton* and its progeny.

Regrettably, the Commonwealth's courts, which did not have the benefit of our decision in *Vazquez*, appear to have made the same mistake here.  The trial judge evidently replaced the names of Eley and Mitchell with the term "the other two" rather than replacing each of their names with the term "the other man."  The Superior Court, citing only *Travers*, affirmed because "the trial court ordered that statement[] by Eiland . . . be redacted so that [it] did not refer to [Eley.]"  App. at 263.  If – as we suspect – the Superior Court affirmed the trial judge through a mechanical application of the *Travers* bright-line rule, it thereby

---

[21] We discerned this bright-line rule from the following language of the Pennsylvania Supreme Court:

> "[T]he co-defendant's statement here was redacted to replace references to appellant by name with the term 'the other man.'  Although this was not the type of redaction at issue in *Gray*, the *Gray* Court's reasoning, including its distinction of *Richardson*, leaves little question that this sort of redaction is appropriate under the Sixth Amendment."

*Vazquez*, 550 F.3d at 281 (quoting *Commonwealth v. Travers*, 768 A.2d 845, 850-51 (Pa. 2001)).

unreasonably applied clearly established federal law under *Bruton* and its progeny.

Finally – and this should come as no surprise in light of our discussion of Eley's *Jackson* claim in Part III.A – we conclude that the *Bruton* error was not harmless.  Indeed, the Commonwealth makes no argument to the contrary.  Here, as in *Bruton*, the admission of LeVan's damning testimony about Eiland's confession implicating Eley "added substantial, perhaps even critical, weight to the [Commonwealth's] case in a form not subject to cross-examination."  391 U.S. at 128.  Because the devastating "effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors," we conclude that the *Bruton* error substantially influenced the jury's verdict.  *Id.* at 129.

Accordingly, we will grant Eley *habeas* relief on his *Bruton* claim.[22]

## IV.

For the reasons stated above, we hold that although Eley is not entitled to *habeas* relief on his *Jackson* claim, he is entitled to such relief on his *Bruton* claim. Accordingly, we will reverse the District Court's denial of his *habeas* petition, and we will remand this case with instructions that the District Court order that the Commonwealth retry Eley within 120 days or else dismiss the charges against him and release him from custody.

---

[22] Because we hold that Eley is entitled to *habeas* relief on his *Bruton* claim, we need not reach his final claim that the trial judge's reasonable doubt jury instruction reduced the Commonwealth's burden of proof in violation of the Due Process Clause of the Fourteenth Amendment under *Boyde v. California*, 494 U.S. 370 (1990). For the same reason, we do not decide the related questions that we directed the parties to brief in our certificate of appealability, namely: (1) "Did [Eley] fairly present to the state courts his due process challenge to the trial court's reasonable doubt instructions," and (2) "If this claim was not fairly presented, should this Court consider the question of procedural default even though it was not raised by the Commonwealth in the District Court proceedings or otherwise considered by the District Court?" App. at 3.

54

*Eley v. Erikson, et al.,* No. 10-4725, Dissenting.
COWEN, *Circuit Judge*.

It is well established that, without some real evidence of guilt, a defendant's presence at—and then flight from—the scene of a crime are insufficient to prove his or her guilt beyond a reasonable doubt. Accordingly, it appears that never before in Anglo-American jurisprudence has any court decided that a rational jury could have found a defendant guilty beyond a reasonable doubt based on nothing more than his or her presence and flight—or otherwise concluded that such decision was a reasonable application of clearly established federal law. Because I believe that the Pennsylvania Superior Court's decision thereby constituted an objectively unreasonable application of Supreme Court precedent, I must respectfully dissent.

Like the majority, I recognize the doubly deferential nature of our standard of review under Jackson v. Virginia, 443 U.S. 307 (1979), and AEDPA. In Coleman v. Johnson, 132 S. Ct. 2060 (2012) (per curiam), the Supreme Court recently determined that we "failed to afford due respect to the role of the jury and the state courts of Pennsylvania," id. at 2062. Under Jackson, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (citing Johnson v. Louisiana, 406 U.S. 356, 362 (1972)). This reasonable doubt standard of proof requires the finder of fact "to reach a subjective state of near certitude of the guilt of the accused." Id. at 315 (citing In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)). The Jackson Court also pointed out that "a

properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Id. at 317. In addition, the writ of habeas corpus—the Great Writ—still "stands as a safeguard against imprisonment of those held in violation of the law." Harrington v. Richter, 131 S. Ct. 770, 780 (2011). "Judges must be vigilant and independent in reviewing petitions for the writ, a commitment that entails substantial judicial resources." Id. As the majority recognized, habeas relief under AEDPA still represents "'a guard against extreme malfunctions in the state criminal justice systems.'" (Majority Opinion at 13-14 (quoting Harrington, 131 S. Ct. at 786).)

It is undisputed that a defendant cannot be convicted based solely on evidence of his or her presence at—and then flight from—the scene of the crime, although the Pennsylvania Superior Court did not expressly reference this fundamental principle in its own disposition of Eley's sufficiency of the evidence challenge. "'[M]ere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient' to establish that a defendant was part of a conspiratorial agreement to commit the crime," and, accordingly, there must be "some additional proof" that the defendant intended to commit the crime together with his or her co-conspirators. Commonwealth v. Murphy, 844 A.2d 1228, 1238 (Pa. 2004) (quoting Commonwealth v. Lambert, 795 A.2d 1010, 1016 (Pa. Super. Ct. 2002)). Likewise, "a defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene." Id. at 1234 (citing

2

Commonwealth v. Wagaman, 627 A.2d 735, 740 (1993)); see also, e.g., Commonwealth v. Kimbrough, 872 A.2d 1244, 1255 (Pa. Super. Ct. 2005) (noting that it is well settled that mere presence at scene of crime is not enough to establish accomplice liability). "There must be some additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so." Murphy, 844 A.2d at 1234 (citing Wagaman, 627 A.2d at 740). Flight may indicate consciousness of guilt and may be considered as evidence, along with other proof, supporting an inference of guilt. See, e.g., Commonwealth v. Hargrave, 745 A.2d 20, 23 (Pa. Super. Ct. 2000). "Nonetheless, this only holds true in cases in which the other evidence of guilt consists of more than mere presence at the scene." Id. at 24. In the end, "'mere presence on the scene both immediately prior to and subsequent to the commission of a crime and flight therefrom is not sufficient to prove involvement in the crime." Id. at 23-24 (quoting Commonwealth v. Goodman, 350 A.2d 810, 811-12 (Pa. 1976)).

The majority itself acknowledges that "this is a close case" under Jackson, going so far as to state that, "had we been the Superior Court, we might even have reversed his conviction." (Majority Opinion at 32.) Ultimately, Eley's conviction for conspiracy to commit robbery, robbery, and second-degree murder was based on nothing more than his presence at the scene of the crimes and his flight from the scene. Applying the well-established legal principles summarized above, I conclude that his conviction cannot be allowed to stand. In short, it was objectively unreasonable for

3

the Pennsylvania Superior Court to decide that a rational jury could have found Eley guilty of second-degree murder, robbery, and conspiracy to commit robbery beyond a reasonable doubt. This case thereby presents us with the kind of "extreme malfunction[] in the state criminal justice system[]" that federal habeas relief under AEDPA is actually meant to remedy. Harrington, 131 S. Ct. at 786 (quoting Jackson, 443 U.S. at 332 n.5 (Stevens, J., concurring in judgment)).

Focusing in particular on the conspiracy charge, the majority summarizes the evidence presented to the jury in some detail and also identifies a rather extensive range of inferences that a rational jury allegedly could have drawn from this evidence. I observe that, in contrast, the Pennsylvania Superior Court's own discussion of Eley's sufficiency of the evidence claim was rather cursory. For example, it stated, without any explanation, that "they [Eley and his two co-Defendants] were seen acting together when the victim was shot." (A261.) In any case, I must reject the majority's own approach because it would have been clearly unreasonable for a jury to draw many of these proffered inferences given the evidence that was presented at trial.

For instance, the majority concluded that "a jury could have rationally inferred that Eley intended and agreed to rob DeJesus with his co-defendants" because, in turn, a rational jury could have inferred that: (1) Eley was prepared to prevent DeJesus from fleeing based on the testimony that two men waited right beside the taxi while one man entered and two shots were fired; (2) he was ready to help in hiding the

4

murder weapon based on the testimony that he fled with his co-Defendants towards an abandoned house where multiple weapons were found; and (3) he was attempting to hide his guilt given his false statement to the police. (Majority Opinion at 24.) Nevertheless, I observe that none of the witnesses actually testified that the other two men attempted to block the victim's escape, acted as a lookout, or did anything else to aid or support the shooter. As the majority itself notes, a mere five seconds elapsed between the second and third shots. It also acknowledges "that Eley and his co-defendants were loitering in the area of Hummel and Kittatinny" and "that they regularly hung out there." (Id. at 25.) Furthermore, McDonald testified that she did not see any weapons, and Fonseca similarly told the jury that he did not see the men carrying anything while they were running away. There was no evidence that Eley benefited from the robbery itself (e.g., possession of the money stolen from DeJesus) or that there were any earlier encounters with, or threats against, DeJesus himself. The police officers likewise did not find any of the co-Defendants' fingerprints on the abandoned house's doorknobs or the weapons they recovered and, more broadly, did not uncover anything else (e.g., any identification or pictures) connecting Eley with this building. I further note that Eley's police statement, like his flight from the scene, at best indicated consciousness of guilt. Given the absence of any real evidence indicating that he intended and agreed to engage in criminal activity—or at least intended to aid or promote such activity and then actively participated in the activity itself—this statement was clearly not sufficient to sustain his conviction.

5

The Supreme Court's recent <u>Coleman</u> opinion further highlights the objective unreasonableness of the Pennsylvania Superior Court's decision. The majority itself acknowledges that "the evidence is less compelling in this case than in <u>Coleman</u>." (<u>Id.</u> at 23.) In fact, the <u>Coleman</u> Court observed that the prisoner and his co-defendant—who "'ran the streets together'"—attempted to collect a debt from the victim earlier on the day of the murder, the victim resisted and humiliated the co-defendant in public by beating him with a broomstick, and the enraged co-defendant repeatedly declared his intent to kill the victim in the prisoner's presence. <u>Coleman</u>, 132 S. Ct. at 2065. The prisoner then helped the co-defendant, who was noticeably concealing a bulky object under his trenchcoat, to escort the victim into the alley. <u>Id.</u> While the prisoner stood at the entryway, the co-defendant pulled out a shotgun and shot the victim in the chest. <u>Id.</u> As I have already observed, one of the witnesses at Eley's trial actually testified that she did not see any weapons. There also was an absence of any evidence of either any prior encounters with—or threats against—DeJesus or that the two men by the taxi acted to block his escape or otherwise assist the shooter. Given the circumstances, the Pennsylvania Superior Court's decision clearly constituted an objectively unreasonable application of <u>Jackson</u>.

For the foregoing reasons, I would vacate the District Court's denial of Eley's sufficiency of the evidence claim and direct the District Court to order his unconditional release from custody with prejudice to any re-prosecution. <u>See, e.g.</u>, <u>O'Laughlin v. O'Brien</u>, 568 F.3d 287, 309 (1st Cir. 2009) ("Because double jeopardy principles apply here, we remand

6

to the district court to order O'Laughlin's unconditional release with prejudice to reprosecution." (citing <u>Burks v. United States</u>, 437 U.S. 1, 18 (1978))).  I therefore cannot join the majority's discussion of the Confrontation Clause claim or its judgment remanding this case for a possible retrial.