PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1650
_____

CANDICE STARUH,
                            Appellant

v.

SUPERINTENDENT CAMBRIDGE SPRINGS SCI;
DISTRICT ATTORNEY CUMBERLAND COUNTY
PENNSYLVANIA;
ATTORNEY GENERAL OF THE COMMONWEALTH OF
PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
M.D. Pa. No. 3-11-cv-01604
District Judge: The Honorable Matthew W. Brann

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
May 17, 2016

Before: SMITH, HARDIMAN, and NYGAARD,
*Circuit Judges*

(Filed: June 30, 2016)

Frederick W. Ulrich, Esq.
Office of Federal Public Defender
100 Chestnut Street
Suite 306
Harrisburg, PA  17101
        *Counsel for Appellant*

David J. Freed, Esq.
Matthew P. Smith, Esq.
Charles J. Volkert, Esq.
Cumberland County Office of District Attorney
1 Courthouse Square
2nd Floor, Suite 202
Carlisle, PA  17013
        *Counsel for Appellee*

_____

OPINION
_____

SMITH, *Circuit Judge*.

No mother wants to see her daughter go to prison, no matter how frayed their relationship.  In some cases, a mother may attempt to take the blame for her daughter's crime. Pennsylvania, like the federal system, requires courts to evaluate such inculpatory statements for indicia of truthfulness in order to ensure that justice is not being subverted.  Here, on the eve of Candice Staruh's homicide trial, her mother Lois "confessed" to a horrific crime during

2

an interview with a defense investigator – despite having denied responsibility for two and a half years. When she did confess, she refused to do so under circumstances that would have subjected her to criminal liability. For example, she never confessed to the prosecutor and she refused to testify at trial. A Pennsylvania court refused to admit Lois' hearsay confession at her daughter's trial, and the District Court denied the daughter's petition for a writ of habeas corpus. On appeal, Candice Staruh argues that this refusal to admit a hearsay confession violated her due process right to present her defense. She relies heavily upon the Supreme Court's decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973). For the reasons stated below we will affirm.

## I.

On October 27, 2003, emergency medical services responded to a call concerning an unresponsive child at a home in Newville, Pennsylvania. When they arrived, three-year-old Jordan was not breathing and did not have a pulse. The emergency medical technicians ("EMTs") observed bruises all over Jordan's body, with some that were particularly severe across his ribs. They also noticed vomit on the floor, on Jordan's face and neck, and in his mouth.

Jordan's mother, Candice Staruh, is the Defendant/Appellant in this case. The EMTs asked her about the bruising and she told them that the bruising was caused by a combination of prior falls and horseplay with Jordan's four-year-old brother Kamden. Staruh told them that "[Jordan] fell [off of a stool] and hit his head on a metal door before he fell onto the floor." JA 309. Jordan was transported to Carlisle

3

Hospital, where hospital staff were unable to revive him. Staruh repeated her version of the story to the coroner and to the investigating police officers: that Jordan had fallen off of a stool and that the bruises were the result of prior falls and horseplay with Kamden.

A forensic pathologist conducted an autopsy of Jordan during which significant bruising to Jordan's abdomen, sides, and back were examined. The pathologist concluded that the bruises were a mix of older and more recent injuries, and that they were too severe to have been caused by his four-year-old brother. He also found gray material, consistent with duct tape, on Jordan's back, and the pattern of bruising on the abdomen and back were consistent with being bound by duct tape. The pathologist determined that Jordan's death was caused by blunt force trauma to the head and neck and deemed the manner of death to be a homicide.

The police investigation noted the deplorable state of the house where Staruh lived with her three children – Jordan, Kamden, and an infant brother. The house was owned by Staruh's mother, Lois, who also lived with Staruh and the children. Investigators saw diapers on the floor, kitchen faucets that did not work, a sink overflowing with dirty dishes, and toilets that were used without water. The house smelled of garbage, and animal droppings were found throughout the kitchen.

Staruh was arrested and charged with first and third degree murder, aggravated assault, and endangering the welfare of a child. Lois was also arrested and shortly thereafter, on June 24, 2005, pleaded guilty to endangering

4

the welfare of children. At her plea agreement hearing, her attorney added that Lois was not admitting to causing any injury to Jordan, as she had only violated her duty of care regarding the condition of her home.

While in jail awaiting trial, Staruh told one cellmate that she had made sandwiches for her children on the day of Jordan's death. According to this version, Jordan was sitting on a stool, tearing his sandwich apart, which caused her to become angry. She told this cellmate that she backhanded Jordan, causing him to flip off of his stool and hit his head on the heater. Staruh told another cellmate that when she woke up, she found Jordan in the kitchen making a mess and so she slapped him, causing him to fall and hit his head on the entertainment stand.

On October 27, 2003, Kamden and the infant were placed in foster care. Kamden made comments to several people about what he saw on the night that his younger brother Jordan died. First, in a videotaped interview with Karen Helfman, a child interview specialist at Children's Resource Center, Kamden was asked about his "friend Jordan." JA 528.[1] Kamden said that Jordan was in heaven now because his mother smacked his face, causing Jordan to

---

[1] The Children's Resource Center is an organization where children are brought "if there has been suspected abuse or they have witnessed a violent crime." JA 521. Its employees are given no information about the child or about the event witnessed other than the child's name, age, and date of birth. The interviewer attempts to develop a rapport with the child and asks open-ended, not leading questions.

5

fill up with green oil, which Ms. Helfman took to mean vomit. Kamden moved in with the Eisenhart family, and he told Tina Eisenhart how his mom killed his friend Jordan when she hit him. He told her that "mommy hit [Jordan] and pushed him back into a door and . . . he fell down and died." JA 485. He also told Ms. Eisenhart that he had a secret, which was that he saw "mommy . . . kill[] Jordan." JA 488. Finally, Kamden and Staruh interacted at a supervised Children and Youth visit where Jimmy Jackson (Kamden's father) and Jonathan Jackson (Kamden and Jordan's infant brother) were present. A Children and Youth Services employee named Jason Sullivan walked into the room, where Kamden was underneath a chair. Kamden said "Jason, I have something to tell you. The day that Jordan died mommy pushed him and he died." JA 501. When Staruh asked how he knew that, Kamden said "I saw you." JA 501.

On December 2, 2005, after the prosecution asserted its intention to call Kamden to testify, a preliminary hearing was held in the presiding judge's chambers pursuant to the Tender Years Doctrine.[2] At the hearing, Kamden was able to

---

[2] The Tender Years Doctrine provides that certain procedures must be followed whenever a prosecution or adjudication involves a "child victim" or "child material witness." 42 Pa. C.S.A. § 5985. As the first step, "the court must determine, based on evidence presented to it, that testifying either in an open forum in the presence and full view of the finder of fact or in the defendant's presence will result in the child victim or child material witness suffering serious emotional distress that would substantially impair the child victim's or child

communicate well and was knowledgeable about the world around him. He showed his understanding of the importance of telling the truth and repeatedly expressed confidence that he could remember the events that occurred two years before when he was four years old. After talking to Kamden again during a break in the trial, the trial court found him competent to testify.

Lois' version of events – that she had nothing to do with Jordan's injuries or his death – changed shortly before trial began. Staruh's mother pleaded guilty only to endangerment of children on June 24, 2005, and her attorney explicitly stated that her guilty plea was limited solely to her violation of her duty of care. Staruh's court-appointed investigator interviewed Lois on June 12, 2006. During this interview, Lois admitted to the investigator that she had abused Jordan by hitting him on the ribs with a metal sweeper pipe numerous times, throwing him against the wall where he would hit his head, and restraining him with duct tape to keep him from getting up during the night. She stated, "I think I am partly responsible for his death, not Candice," JA 1041, and that Staruh would only ever yell or hit the baby on the bottom, not on the head or body. She said that "I am leaving this in God's hands. And I must tell the truth as my daughter

---

material witness's ability to reasonably communicate." *Id.* § 5985(a.1).

7

does not deserve to die for what I or Jackson[3] probably did." JA 1041. Despite these revelations, Lois stated that if questioned in court, she intended to invoke her Fifth Amendment privileges. Lois was appointed counsel to represent her in her capacity as a witness.

On June 21, 2006, the day that the trial began, Lois again spoke to the investigator while he was serving subpoenas on Lois' two sons. Lois said that "Candice *did not* hurt Jordan it was me – I have settled this with God and I will accept what occurs." JA 1043. Such acceptance did not, however, include testifying. Lois again said that if she were called as a witness she would assert her rights under the Fifth Amendment because "my Attorney said I could get in trouble if I say this in Court so I can't." JA 1043. On June 23, 2006, Lois called the investigator concerning a subpoena that she had received. She said that if she testified her parole officer would put her in jail, and "I don't want to go to jail," but that her daughter was innocent and she wanted to help her. JA 1042. Lois also said that she had something important to tell the investigator. At this point, the investigator told her not to speak further about the case, as she now had counsel and everything that she said to him would be memorialized.

After trial began on June 21, 2006, Kamden and the three persons whom he made statements to testified for the prosecution. Staruh's defense implied that it was Lois, not

---

[3] Lois allegedly told the investigator that James Jackson, the father of Jordan, also physically abused Jordan and that "a lot of the injuries would be seen on the baby when Jackson was alone with the baby." JA 1041.

Staruh, who killed Jordan. She elicited testimony from Kamden that he sometimes called Lois "mom"; from Karen Helfman that when she asked Kamden his mother's name he said something that sounded like "lettuce"; from the ex-wife of one of Staruh's brothers that both Staruh and Lois treated Jordan poorly and Lois beat Jordan; and from the same ex-wife that Staruh was shy, while Lois was dominant and controlling.

Staruh, who testified on her own behalf, stated that Lois abused Jordan and had abused Staruh as a child. She said that she was afraid of her mother, which was why she never left her house, and that she had recently been diagnosed with battered woman syndrome. Staruh also testified that on the day that Jordan died, he was on a stool watching cartoons. She said that she laid down for a few seconds, but got up when she heard Jordan fall. According to her, she went over to check on him, and when she turned around Kamden told her that Jordan was getting sick. Staruh testified that Jordan was throwing up, having trouble breathing, and looked "like a baby doll." JA 652. While Lois attempted to perform CPR, Staruh ran next door to a neighbor's house to call 911. At trial, her story of the bruises differed from what she had told the EMTs, coroner, and the police throughout the investigation – that they were caused by previous falls and horseplay with his four-year-old brother Kamden. Instead, she placed full blame for the bruises on her mother, Lois. However, she never identified her mother as the cause of Jordan's death, saying "I didn't see her do anything that caused him to actually die." JA 658.

9

During the trial, but outside the presence of the jury, defense counsel called Lois as a witness. Lois said that she was unwilling to testify and asserted her Fifth Amendment right to refuse to do so. Defense counsel sought to have her assert the Fifth Amendment in the presence of the jury, which the trial court denied. Following this ruling, defense counsel moved for permission to introduce the statements that Lois had made to the investigator as statements against her penal interests pursuant to Pennsylvania Rule of Evidence 804(b)(3). However, the trial court denied this motion, concluding that the statements lacked the indicia of trustworthiness required under Rule 804(b)(3) to introduce a statement against penal interest.

The jury acquitted Staruh of first degree murder, but found her guilty of third degree murder, aggravated assault, and endangering the welfare of a child. In September of 2006, Staruh was sentenced to 18 to 40 years imprisonment.

## II.

Staruh filed a direct appeal arguing, among other things, that if Lois' invocation of the Fifth Amendment was proper, the court should have admitted her out-of-court statements to the defense investigator. In its opinion in support of its judgment, the trial court stated, "the circumstances surrounding the statements demonstrate their untrustworthiness." JA 859. The Pennsylvania Superior Court affirmed, holding that "the circumstances surrounding the statements against interest do not provide assurance of their reliability." JA 976. Specifically, the Superior Court noted that Lois had repeatedly claimed that she bore no

10

responsibility for Jordan's death for two and a half years before "confessing" on the first day of trial, that her confession came right before her daughter was to be tried for murder, and that she asserted her intention to invoke the Fifth Amendment when she realized that she could be tried for murder herself.

Staruh argued before the Superior Court – as she argues before us – that the Supreme Court's decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973), mandated reversal. The Superior Court rejected this argument, holding that the inculpatory third-party declarations in *Chambers* were more credible, and therefore distinguishable, for three reasons: (1) unlike in *Chambers*, Lois never signed a written confession and never intended to be held accountable for her statements; (2) Lois asserted her privilege against self-incrimination and was unavailable to testify, whereas in *Chambers* the confessor testified under oath and the trial court erred in not allowing cross-examination about his confession; and (3) the confessor in *Chambers* had no reason to incriminate himself, while Lois had an interest in preventing her daughter from being convicted of murder.

The Pennsylvania Supreme Court denied Staruh's petition for allowance of appeal. Staruh then filed a *pro se* Post Conviction Relief Act (PCRA) petition. Counsel was appointed, but subsequently withdrew and filed a no-merit letter. The PCRA petition was dismissed as raising arguments that had previously been litigated, such as the *Chambers* claim before us, and because allegations

concerning newly discovered evidence were without merit. Staruh did not pursue this action further in state court.[4]

In 2011, Staruh filed a timely *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising ten claims. Magistrate Judge Smyser issued a report and recommendation that recommended denying the habeas petition, which Judge Caputo adopted. However, upon Staruh's later petition to amend, Judge Caputo vacated the order and granted her leave to amend her exhausted, non-defaulted claims.[5] In her amended petition, Staruh argued,

---

[4] A prisoner filing a habeas petition under § 2254 must exhaust available state remedies before filing in federal court. 28 U.S.C. § 2254(b)(1)(A). In Pennsylvania, a petitioner seeking state collateral relief may only raise arguments that have not been previously litigated or waived, 42 Pa. C.S.A. § 9543(a)(3), in "the highest appellate court in which the petitioner could have had review as a matter of right. *Com. v. Morales*, 701 A.2d 516, 518-20 (Pa. 1997) (quoting 42 Pa. C.S.A § 9544(a)(2)). Thus, Appellant was not entitled to postconviction relief under the PCRA and exhausted her state remedies when her direct appeal was dismissed by the Superior Court. She was not required to file a PCRA petition, and she similarly was not required to appeal the dismissal of such petition. *Lambert v. Blackwell*, 134 F.3d 506, 519 (3d Cir. 1997).

[5] Judge Caputo held that the report and recommendation was adopted insofar as it determined that many of Staruh's claims were procedurally defaulted.

12

among other issues, that the state trial court erred in not allowing the defense investigator to testify that Lois told him that she was at fault for Jordan's death. Staruh had counsel appointed to represent her in the habeas proceedings.

Magistrate Judge Schwab issued a report and recommendation holding that the Superior Court's determination that Lois' out-of-court statements were not made under circumstances that provided "considerable assurance of their reliability" was reasonable. JA 1114. Specifically, the report and recommendation stated that "[g]iven the differences between this case and *Chambers*, Staruh cannot show that the Superior Court's decision was contrary to or an unreasonable application of *Chambers*." R. & R., *Staruh v. Winstead*, No. 3:11-cv-01604 (M.D. Pa. Feb. 13, 2015), ECF No. 28. Because Staruh also failed to show that the Superior Court's decision was based on an unreasonable determination of the facts, she was not entitled to habeas relief.[6] In adopting the report and recommendation, the District Court noted the "significant factual differences" between this case and *Chambers* and that Lois' extrajudicial

---

[6] The Magistrate Judge also rejected Staruh's argument that the trial court's decision allowing Lois to invoke the Fifth Amendment violated *Chambers* because "*Chambers* simply did not deal with a witness who invoked the Fifth Amendment privilege against self-incrimination." JA 1108. The only *Chambers* argument before us on appeal is that concerning the statements made to the defense investigator.

13

statements were not reliable. *Staruh v. Winstead*, No. 3:11-cv-01604, 2015 WL 640662, at \*3 (M.D. Pa. Feb. 13, 2015). In a slightly different analysis from the Superior Court, the District Court focused on three indicia of reliability in *Chambers* that were lacking here: (1) that the statements in *Chambers* were made immediately after the homicide, while the statements here were made on the eve of trial; (2) that the extrajudicial statements in *Chambers* could be confirmed by the sworn confession of the third party, while here there was no corroborative evidence to confirm Lois' statements regarding her culpability; and (3) that the party in *Chambers* who made the extrajudicial statements was present at trial and could be cross-examined, while Lois invoked the Fifth Amendment and was unavailable to testify. *Id.*

### III.

The District Court had jurisdiction over Staruh's habeas petition pursuant to 28 U.S.C. §§ 2241 and 2254. We have jurisdiction over the District Court's order denying Staruh's habeas petition pursuant to 28 U.S.C. §§ 1291 and 2253.[7] "Our review of the District Court's decision is plenary because no evidentiary hearing was held." *Eley v. Erickson*, 712 F.3d 837, 845 (3d Cir. 2013). We therefore review the Superior Court's decision under "the same standard that the District Court was required to apply." *Lewis v. Horn*, 581 F.3d 92, 100 (3d Cir. 2009).

---

[7] Although the District Court denied a certificate of appelability, a motions panel of this Court granted a certificate of appealability on August 24, 2015.

14

We apply the highly deferential standard imposed by AEDPA. 28 U.S.C. § 2254(d); *Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings.'" (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997))). AEDPA prohibits the federal courts from granting habeas relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). The Supreme Court has called this standard "difficult to meet," *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and it "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

A state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), if it "applies a rule that contradicts the governing law set forth" by the Supreme Court or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

A state court has based its decision on "an unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d)(2), "only if the state court's factual findings are 'objectively unreasonable.'" *Eley*, 712 F.3d at 846 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). "Factual determinations by state courts are

15

presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340 (citing 28 U.S.C. § 2254(e)(1)).

In this case, Staruh asserts both grounds for AEDPA relief. She argues "the rulings of the Pennsylvania courts excluding the exculpatory evidence are contrary to or an unreasonable application of federal law, and involve an unreasonable determination of the facts in light of the evidence presented." Appellant Br. at 21.

## IV.

Specifically, Staruh argues that the Superior Court's application of Pennsylvania Rule of Evidence 804(b)(3) violated her due process right to present a defense and was contrary to the Supreme Court's decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973).

Pennsylvania Rule of Evidence 804(b)(3) provides that, if a declarant is unavailable,[8] a statement against interest

---

[8] It is not contested that Lois was unavailable as a witness because she refused to testify in her daughter's trial. Pa. R. Evid. 804(a) (defining unavailability to include situations where the declarant "is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies"); *Commonwealth v. Bazemore*, 614 A.2d 684, 685 (Pa. 1992) ("A witness who invokes his or her Fifth Amendment privilege is deemed 'unavailable' for the purpose of testifying provided the court first determines

16

is not excluded by the rule against hearsay. Specifically, the rule defines a statement against interest as one that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa. R. Evid. 803(b)(3).

Here, although the requirements of (A) may have been satisfied, the requirements of (B) were not. The Pennsylvania Supreme Court explains that this "rule requiring assurance of the trustworthiness and reliability of an out of court statement" is justified by "[e]xperience [that] teaches us that it is not rare for friends, peers and family members to go to extraordinary lengths to help an accused win an acquittal or avoid a jail sentence." *Commonwealth v. Bracero*, 528 A.2d 936, 941 (Pa. 1987).

---

that the witness' concern with self-incrimination is legitimate.").

17

Both parties properly focus their arguments on the Supreme Court's decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973). In *Chambers*, the defendant was convicted of murdering a police officer due in large part to the "strict application of certain Mississippi rules of evidence" that prevented him from introducing multiple inculpatory statements made by a third party or from treating a defense witness as adverse. *Id.* at 289. Such a strict application of the evidentiary rules "rendered his trial fundamentally unfair and deprived him of due process of law." *Id.* at 289-90. Staruh similarly claims that the state court's refusal to allow Lois' inculpatory statements to the defense investigator deprived her of due process of law. However, the Supreme Court in *Chambers* explicitly stated that its holding was limited to "the facts and circumstances of this case," *id.* at 303, as the hearsay statements at issue "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300. Upon an examination of the facts of *Chambers*, it is apparent that we do not have comparable assurances of reliability.

In *Chambers*, the defendant called a third party, named McDonald, as an adverse witness. *Id.* at 288. Two days after the murder of a police officer, McDonald had given a sworn statement to the defendant's attorneys to the effect that he, McDonald, shot the police officer. *Id.* The confession was transcribed, signed, and witnessed, and McDonald was turned over to the police and placed in jail. *Id.* at 288. One month later, during a preliminary hearing, he repudiated his sworn confession and testified that he was not even at the scene of the crime. *Id.* McDonald was released, and the defendant

18

proceeded to trial. *Id.* at 287. When McDonald was called as a defense witness, the defendant had the confession admitted into evidence and read to the jury. *Id.* at 291. On cross-examination, the third party reiterated his version of the story that he did not shoot the police officer and that he had only confessed based on a promise that he would not go to jail and that he would share "in a sizeable tort recovery from the town." *Id.* at 291. On redirect, the defendant sought to examine McDonald as an adverse witness, but was barred from doing so because McDonald's testimony was not technically adverse to the defendant. *Id.* at 291-92.

In an attempt to argue that McDonald was the real perpetrator of the crime, the defense sought to call three witnesses. One witness would have testified that McDonald told him that he had shot the police officer on the night of the crime. *Id.* The second witness would have similarly testified that McDonald confessed to him on the night of the crime and that McDonald reminded him of this confession a week later when he urged the witness not to "mess him up." *Id.* The second witness would also have disavowed McDonald's testimony that McDonald was not at the scene of the crime because he was having beers with the second witness. *Id.* Finally, the defense sought to introduce the testimony of McDonald's neighbor, who would have testified that McDonald told him on the morning after the crime that he had committed the murder. *Id.* at 293. McDonald also allegedly told the third witness that he had disposed of the firearm used in the murder, and the third witness went with McDonald to purchase a new revolver several weeks after the shooting to replace the murder weapon. *Id.* The jury, however, was not allowed to hear the testimony of any of

19

these witnesses, which were excluded as hearsay statements. *Id.*[9]

The Supreme Court recognized that hearsay statements "are traditionally excluded because they lack the conventional indicia of reliability." *Id.* at 298. For example, they are usually not made under oath or under "circumstances that impress the speaker with the solemnity of the statements," the speaker is not subject to cross-examination, and he is not available in court so that his credibility and demeanor may be assessed by the jury. *Id.* While there are exceptions to the hearsay rule, the Court noted that often confessions of criminal activity "are . . . motivated by extraneous considerations and, therefore, are not as inherently reliable as statements against pecuniary or properietary interest." *Id.* at 300.

---

[9] At the time, Mississippi did not have a hearsay exception for statements against penal interest such as Pennsylvania's current Rule of Evidence 804(b)(3). *Chambers v. Mississippi*, 410 U.S. 284, 299 (1973). Pennsylvania did not codify its rules of evidence until 1998, before which its evidentiary rules were matters of common law. *See Commonwealth v. Kimbell*, 759 A.2d 1273, 1276 (Pa. 2000). The Pennsylvania Rules of Evidence largely mirror the Federal Rules of Evidence. *See* Pa. R. Evid. 101 Preface to Comments ("The Pennsylvania Rules of Evidence closely followed the format, language, and style of the Federal Rules of Evidence, but the guiding principle was to preserve the Pennsylvania law of evidence.").

Nonetheless, the exclusion of the statements in *Chambers*, in tandem with the state court's refusal to allow the defendant to cross-examine McDonald "denied him a trial in accord with traditional and fundamental standards of due process." *Id.* at 302. The Supreme Court gave four reasons why the statements "provided considerable assurance of their reliability." *Id.* at 300. First, each confession "was made spontaneously to a close acquaintance shortly after the murder had occurred." *Id.* at 300. Second, each was corroborated by other evidence in the case, such as McDonald's sworn confession; the testimony of another eyewitness to the shooting; and the testimony that McDonald was seen holding a revolver similar to the type used in the shooting, was known to own a revolver of the type used in the shooting, and that he subsequently disposed of and then replaced this weapon. *Id.* The Court also noted that "[t]he sheer number of independent confessions provided additional corroboration for each." *Id.* Third, the Supreme Court stated that "each confession here was in a very real sense self-incriminatory and unquestionably against interest," because there was nothing for McDonald to gain by disclosing his guilt to his friends and he "must have been aware of the possibility that disclosure would lead to criminal prosecution," as further evidenced by his warning to the second witness to not "mess him up." *Id.* at 301. Finally, the Court emphasized that McDonald was present in the courtroom and under oath, and thus he was subject to cross-examination where his demeanor and responses could be weighed by the jury. *Id.*

We have interpreted *Chambers* to stand for the proposition that a criminal defendant has a "due process right

21

to have clearly exculpatory evidence presented to the jury, at least when there is no strong countervailing systemic interest that justifies its exclusion." *United States v. Mike*, 655 F.3d 167, 171 (3d Cir. 2011) (quoting *United States v. Herman*, 589 F.2d 1191, 1204 (3d Cir. 1978)). Thus, a state may not violate this right "by the strict application of certain . . . rules of evidence." *Chambers*, 410 U.S. at 289. Pennsylvania courts have interpreted one systemic interest to be the inherent unreliability of such statements, as "it is not rare for friends, peers and family members to go to extraordinary lengths to help an accused win an acquittal or avoid a jail sentence." *Bracero*, 528 A.2d at 941. Federal Rule of Evidence 804(b)(3) similarly requires that an inculpatory statement by a third party offered to exculpate a criminal defendant be "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3)(B). We have interpreted this as a rule that "reflects the concern that a third party with less risk of prosecution will fabricate a confession to exculpate the guilty party." *United States v. Caldwell*, 760 F.3d 267, 289 (3d Cir. 2014).

Staruh acknowledges that the Court in *Chambers* noted that the statements there "bore persuasive assurances of trustworthiness," *Chambers*, 410 U.S. at 302, but argues that "the Court did not limit what criteria govern such a finding." Appellant Br. at 21. She claims that Lois' statements *were* trustworthy, given that they were made before and during trial; were made on more than one occasion to a court-appointed investigator; were never repudiated; were very detailed; and were not the result of threats or inducements. However, the Superior Court properly distinguished these facts from *Chambers*. Lois never signed a written confession

or indicated an intent to be held accountable for her actions, as evidenced by her refusal to testify out of a fear of going to prison.[10] This is in stark contrast to McDonald in *Chambers*, who signed a sworn affidavit knowing that he was placing himself at risk of being convicted for the murder, *Chambers*, 410 U.S. at 287, and acknowledged that his statements in the aftermath of the murder could "mess him up." *Id.* at 301. Moreover, McDonald made his incriminating statements immediately after the murder to multiple people before reversing course once he found himself facing criminal charges. *Id.* Here, by contrast, Lois maintained her innocence for the murder for over two and a half years, including under oath at her guilty plea hearing, before finally "admitting" to the crime on the eve of trial, and then only to the defense investigator.

We agree with the Superior Court that, unlike the evidence excluded in *Chambers*, Lois' statements had no indicia of credibility. Lois, in making the statements, was attempting to have her cake and eat it too.[11] She was hoping to prevent her daughter from being convicted of murder by

---

[10] Staruh attempts to argue that both the District Court and the Pennsylvania Superior Court improperly placed great weight on the fact that she did not testify while the third party in *Chambers* did. While she is correct that Rule 804(b)(3) applies only to unavailable declarants, her failure to testify is extremely probative of the truthfulness of her statements.

[11] We also note that Staruh appears to have been unable to obtain an affidavit from Lois reaffirming her confession at any point during the federal habeas proceeding, casting further doubt on its truthfulness.

confessing to the crime, while at the same time avoiding criminal liability herself. Her last-minute change of heart, after she had both pleaded guilty to the lesser offense of endangering a child and disavowed any responsibility for Jordan's death for two and a half years, further supports this view. This appears to be a "justice-subverting ploy" that provides the justification for requiring indicia of truthfulness. *Chambers*, 410 U.S. at 301 n.21 (discussing a scenario where person A is a defendant, person B tells persons C and D that he committed the crime and then goes into hiding, persons C and D testify at A's trial, and then person B – who did not commit the crime – returns from hiding and has several witnesses to corroborate his innocence); *Caldwell*, 760 F.3d at 290 (holding that an inculpatory statement by a declarant was not reliable when he viewed the defendant "like an older brother," providing a motivation to lie; the statement was made only to defense investigators and not to prosecutors; the declarant was not under oath, had not been read his *Miranda* rights, and was not represented by counsel; and the declarant ultimately recanted his admission); *Bracero*, 528 A.2d at 941 (noting that "it is not rare for friends, peers and family members to go to extraordinary lengths to help an accused win an acquittal or avoid a jail sentence").

## V.

For the reasons stated above, we will affirm the dismissal of Staruh's habeas petition.

24