**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4506
_____


PAUL MCKERNAN,
                              Appellant

v.

SUPERINTENDENT SMITHFIELD SCI;
THE DISTRICT ATTORNEY OF THE COUNTY OF
PHILADELPHIA;
THE ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA

_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. Civil Action No. 2-06-cv-02118)
District Judge:  Honorable Norma L. Shapiro

_____


Argued on June 21, 2016

Before:  *FISHER, GREENAWAY, JR. and ROTH,
Circuit Judges


(Opinion filed: February 28, 2017)

Maria K. Pulzetti, Esquire                    (**Argued**)
Federal Community Defender Office for
the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

            Counsel for Appellant

Joshua S. Goldwert, Esquire               (**Argued**)
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA 19107

            Counsel for Appellees

_____

O P I N I ON OF THE COURT

_____

_____

* The Honorable D. Michael Fisher assumed senior status on
February 1, 2017.

2

**ROTH**, Circuit Judge:

In this appeal, Paul McKernan contends that, because of the egregious advice given him by his counsel, he was deprived of the right to a fair trial before an impartial tribunal. He asserts that the judge in his murder trial was so concerned over what she considered to be "slanderous," "hurtful," and "terrible things" written about her on a website that she lost her ability to be impartial. He further asserts that his counsel, unlike any competent counsel, failed to recognize this loss of impartiality and, in doing so, deprived him of the effective assistance of counsel that the Constitution guarantees. We agree with the latter argument and, for this reason, we will remand this case to the District Court with instructions to grant McKernan's petition for a writ of habeas corpus unless within 60 days of the date of remand, the Commonwealth of Pennsylvania shall decide to retry Paul McKernan.

## I.

In July 1998, after a bench trial in the Philadelphia County Court of Common Pleas, McKernan was convicted of first degree murder in the death of Mark Gibson. McKernan and Gibson were former roommates. McKernan was found to have killed Gibson with a baseball bat during an argument outside McKernan's home. A witness to the events, Joseph Rodgers, did not see McKernan strike Gibson but did hear "a loud thump," after which he saw Gibson lying on the ground, bleeding profusely. McKernan told Rodgers that he hit Gibson in the chest, a statement contradicted by a defense witness who testified that he saw McKernan hit Gibson in the head.

3

A medical examiner testified that Gibson died after being hit behind the ear with a blunt instrument, such as an aluminum baseball bat. McKernan admitted to hitting Gibson with the bat but claimed that it was in self-defense and that Gibson's head injuries arose from the impact of Gibson hitting his head on the curb. The trial judge, Judge Lisa Richette, found McKernan guilty of first degree murder and sentenced him to a mandatory sentence of life in prison without the possibility of parole.

On the second day of the bench trial, after the Commonwealth had rested but before the defense had started its case-in-chief, Judge Richette called the victim's mother, Beatrice Gibson, and his brother, David Gibson, into her robing room, along with the assistant district attorney, Mark Gilson, and defense counsel, Fred Harrison. McKernan was not present for the ensuing meeting, but the meeting was transcribed by the court reporter.

It is difficult to convey in excerpts the inappropriate nature of this lengthy conference. It is even more difficult to understand why defense counsel Harrison failed to object to the proceedings or to move for the judge's recusal at any point during the conference. Harrison himself noted in later testimony that he had never before or since been part of a similar conference.

The judge began the conversation by saying that she was "very disturbed" after finding a website that the Gibsons had created, containing criticism of the judge.[1] The judge said to Mrs. Gibson that the site was "vicious and unfair" and

---

[1] J.A. at 249.

that the judge did not "want to hear this case if" Mrs. Gibson was "unhappy with" her.[2]  The judge had a printed copy of the website and read from portions of it.  The website described an ongoing controversy between the judge and the actor Charlton Heston, who had criticized the judge as being soft on crime and referred to her as "Let 'em Loose Lisa." The judge read a passage from the website stating "Lisa Richette is a bleeding heart judge that often sympathizes with murderers and other violent criminals and gives them light sentences," which the judge characterized as "a total lie."[3] The judge then accused the Gibsons of writing "dreadful, slanderous things about [her]" throughout the website.[4]

Despite the judge's anger caused by the website, she sought the Gibsons's approval of her actions in the trial.  She characterized the case as "a horrible, horrible murder,"[5] told the Gibsons that she "just want[ed] to make sure that you folks are happy with me,"[6] and told the assistant district attorney she didn't "want these people – they have already been hurt enough, and I don't want them to have this case heard by a Judge in whom they have no faith."[7]  She told the Gibsons, "You're very fortunate, I'll tell you what, you have a witness, you have Mr. Rodgers"[8] because, "[m]any of these murders occur with nobody willing to come forward and say I

---

[2] *Id.*
[3] *Id.* at 253.
[4] *Id.* at 259.
[5] *Id.*
[6] *Id.* at 275.
[7] *Id.* at 260.
[8] *Id.* at 279.

saw it."[9] After being assured by the Gibsons that they were "satisfied" with Judge Richette presiding over McKernan's trial, she concluded, "I don't want to open the Daily News tomorrow and read the usual B.S."[10]

Throughout this conversation, McKernan's defense counsel stood mute. Indeed, it was Assistant District Attorney Gilson who eventually asked McKernan's counsel if he was concerned about the conference, to which Harrison replied, "The only input I have is I guess I need to apprise [McKernan] of what is going on."[11] After making this statement, Harrison did not request that the meeting be recessed, but rather left Gilson, the judge, and the Gibsons alone together in the robing room while Harrison conferred with his client. As Harrison left, the judge said, "Go ahead, I'll just talk to [the family] generally."[12]

In Harrison's absence, David Gibson, the victim's brother, who was primarily responsible for creating the offending website, offered to allow the judge to "red line" anything she did not approve of from the site and write her own thoughts about victimology, which David Gibson would post in the judge's "defense."[13] The judge agreed to do so. The judge told Mrs. Gibson that she (the judge) would have acted similarly if the same events had happened to her son,

---

[9] *Id.* at 280.
[10] *Id.*
[11] *Id.* at 283.
[12] *Id.*
[13] *Id.* at 284.

6

noting that "we're all mothers here."[14]   She also told Mrs. Gibson that they were "very lucky" that they were assigned Mr. Gilson, the assistant district attorney, and that "Gilson is one of the best D.A.s in the world."  The Gibsons then left the judge's chambers.[15]

After conferring with McKernan, Harrison returned to the robing room and told the judge and Gilson that his client had "concerns" because the website said the judge was "a lenient judge" and "the fact that you mentioned Mr. Rogers and his testimony, he thinks that you may be constrained to lean over backwards," to prove Mrs. Gibson wrong and the judge would not give McKernan a fair trial.[16]  Gilson had the same concerns.  Harrison said that McKernan was unsure what to do.[17]  Harrison indicated that he had advised McKernan to continue before Judge Richette.  He further noted that he and Gilson believed what "might solve the problem would be if we brought Mr. McKernan back and let him talk to you just like you talked to" the victim's family.[18]

McKernan was brought to the robing room where the judge told him that she had discussed the website with the victim's family, that the family was now satisfied with her because they had been assigned Mr. Gilson, and that the victim's family wanted the judge to continue to hear the case.[19]  She told McKernan that the conversation was "not

---

[14] *Id.* at 286.
[15] *Id.*
[16] *Id.* at 287.
[17] *Id.* at 288.
[18] *Id.* at 287.
[19] *Id.* at 290.

going to influence [her] thinking at all about this" and that she would "listen to your side of the case very carefully and . . . reach a verdict."[20]  She also stated she would "try and pray to God that I be fair to you."[21]  Although McKernan stated that he believed that the judge could be fair, Gilson seemed to sense some doubts in McKernan's demeanor, causing him to ask the judge to allow McKernan more time to speak with Harrison before continuing the colloquy.[22]

After this second private conversation, Harrison stated that he "had an opportunity . . . to speak with [his] client by himself, and . . . indicated to him – reiterated to him what Your Honor has said to him previously.  Mr. McKernan has indicated to me that he thinks that you can be fair."[23]  Gilson asked whether anyone had forced McKernan to accept Judge Richette and if anyone had threatened or promised him anything, to which McKernan replied no.[24]  The bench trial then resumed, with McKernan putting on his defense, after which the judge found McKernan guilty of First Degree Murder.

McKernan appealed his conviction to the Pennsylvania Superior Court, which affirmed in an unpublished opinion.[25]  Among the grounds of the appeal were the claims that "the trial judge erred in failing to recuse herself" based on the

---

[20] *Id.* at 291.

[21] *Id.*

[22] *Id.* at 293-294.

[23] *Id.* at 294.

[24] *Id.* at 295.

[25] *Commonwealth v. McKernan*, 776 A.2d 1007 (Pa. Super. Ct. 2001) (Table).

robing room conference and that Harrison was ineffective for failing to move for recusal. The Superior Court rejected both arguments, finding "neither trial court error nor ineffective assistance of counsel on this record."

McKernan petitioned for post-conviction relief, which the trial court denied. On appeal, McKernan raised a single issue: whether McKernan's "decision, mid-trial, to refuse the Trial Court's offer to recuse itself" was a "knowing, intelligent and voluntary decision and under all the circumstances was a knowing waiver of a constitutional right at the time that it was made and were trial counsel, appellate counsel and post conviction counsel all ineffective for failing to raise and brief this very precise issue." The Superior Court found that the issue had been previously litigated. In the alternative, the Superior Court analyzed the merits of McKernan's motion for post-conviction relief, finding that habeas relief was not warranted. For both reasons, the Superior Court dismissed the petition. The Pennsylvania Supreme Court declined review.

McKernan then filed a *pro se* federal habeas petition raising, among other grounds, the question of whether "[t]rial counsel rendered IAC [ineffective assistance of counsel] by failing to challenge whether the petitioner entered a voluntary, intelligent and knowing waiver regarding the recusal of the trial judge." A Magistrate Judge recommended denial of the habeas petition, to which McKernan, now represented by counsel, objected.

The District Court held an evidentiary hearing on November 24, 2008. After the hearing, the District Court denied the petition but granted a Certificate of Appealability

9

on the issue of whether McKernan had made a substantial showing that the trial judge's failure to recuse violated the due process requirement of a fair trial by a fair tribunal and whether he might be actually innocent of first degree murder, if not some degree of homicide. A panel of this Court expanded the Certificate of Appealability to include the issue of "whether the district court erred in denying [the] claim that trial counsel performed ineffectively by failing to seek and secure relief for the trial court's (alleged) bias." We will consider only this second issue in our consideration of this appeal.

## II.

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 2254; we have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. Our review of the District Court's opinion is plenary.[26] In reviewing a habeas petition under § 2254, we must first be satisfied that the claims have been exhausted, and have not been procedurally defaulted.[27] If these procedural requirements are satisfied, a habeas petition may be granted with respect to a claim that was adjudicated on the merits by a state court only if the state court proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[28]

---

[26] *Showers v. Beard*, 635 F.3d 625, 628 (3d Cir. 2011).
[27] 28 U.S.C. § 2254(b)(1)(A).
[28] 28 U.S.C. § 2254(d).

Under § 2254(d)(1), "[a] state court decision is an unreasonable application . . . if the court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case."[29] This is a high standard, since "[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous."[30] Instead, "[t]he state court's application of clearly established law must be objectively unreasonable before a federal court may grant the writ."[31]

Here, McKernan has not procedurally defaulted his ineffective assistance of counsel claim, and has properly exhausted it in state court. Although the Superior Court dismissed McKernan's *Strickland* claim under Pennsylvania's "previous litigation rule," we have held that claims resolved under this rule are not procedurally defaulted for purposes of federal habeas corpus.[32] Similarly, we have held that claims

---

[29] *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005) (internal quotation marks omitted).

[30] *Rountree v. Balicki*, 640 F.3d 530, 537 (3d Cir. 2011) (internal quotation marks omitted) (alteration in original).

[31] *Id.* (internal quotation marks omitted) (alteration in original).

[32] *Boyd v. Waymart*, 579 F.3d 330, 369-70 (3d Cir. 2009) (en banc) (opinion of Hardiman, J.) (collecting cases). The per curiam opinion in *Boyd* expressly rested on Judge Hardiman's analysis of procedural default and exhaustion. *Id.* at 332 ("For the reasons given in Part III of [Judge Hardiman's] opinion, we conclude Boyd's claim was properly exhausted and has not been procedurally defaulted.").

11

dismissed under the previous litigation rule are properly exhausted.[33]    Accordingly, McKernan has satisfied the procedural requirements of a federal habeas petition, and we may consider the merits of his argument.

McKernan argues that the state courts unreasonably applied Supreme Court precedent as to whether McKernan's trial counsel was ineffective for failing to seek Judge Richette's recusal and for advising McKernan not to seek recusal.  Because the Superior Court considered the merits of McKernan's claims, and did not rest solely on the previous litigation rule, we treat its findings with the deference required by § 2254(d).[34]    The state court and the District Court correctly identified the appropriate Supreme Court precedent to apply as *Strickland v. Washington*.[35]  *Strickland* established the familiar two prong test for evaluating ineffective assistance of counsel claims, under which the petitioner must first show that the counsel's performance was deficient and, second, that the deficient performance was prejudicial to the defendant.[36]    To meet the first prong, counsel's performance must fall "below an objective standard of reasonableness considering all the circumstances."[37] Counsel's performance is deficient only "when counsel made errors so serious that counsel was not functioning as the

---

[33] *Staruh v. Superintendent Cambridge Springs SCI, et al.*, 827 F.3d 251, 256 n.4 (3d Cir. 2016).

[34] *See Rolan v. Coleman*, 680 F.3d 311, 319-21 (3d Cir. 2012).

[35] 466 U.S. 668 (1984).

[36] *Id.* at 687.

[37] *Jacobs*, 395 F.3d at 102.

'counsel' guaranteed . . . by the Sixth Amendment."[38]

**III.**

The deference due state court merits judgments under § 2254(d) and *Strickland* is significant, but it "does not imply abandonment or abdication of judicial review."[39] We have no trouble holding that, in the unique circumstances of this case, counsel's performance in failing to move for recusal of Judge Richette fell far below the minimal standards of competence in the profession and the state court's failure to recognize this incompetence was an unreasonable application of the *Strickland* factors.

Counsel in this matter had tried many cases before Judge Richette and described her as a "colorful jurist." He testified at the hearing before the District Court that, although he had never experienced a situation similar to the robing room conference, he believed that a bench trial before Judge Richette offered the best option for his client. The District Court found that Harrison's decision was strategic in nature and was at least arguably rational. We disagree.

The right to a "fair trial in a fair tribunal is a basic requirement of due process" and derives directly from the Constitution.[40] While a defendant is capable of waiving many rights, including the right to a jury, the absolute

---

[38] *McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 (3d Cir. 2012) (alteration in original).
[39] *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (internal quotation marks omitted).
[40] *In re: Murchison*, 349 U.S. 133, 136 (1955).

13

minimum standard for a constitutional trial is "an impartial trial by jury."[41]  The importance of a fair tribunal is so etched into the bedrock of the American judicial system that few courts have even found a need to address it.  The Seventh Circuit Court of Appeals, for instance, simply observed that certain procedural requirements must be followed, noting that "if the parties stipulated to trial by 12 orangutans the defendant's conviction would be invalid notwithstanding his consent, because some minimum of civilized procedure is required by community feeling regardless of what the defendant wants or is willing to accept."[42]  Similarly, the Second Circuit Court of Appeals reversed a district court's holding that a defendant waived his right to an impartial jury by failing to object to a juror who lied during voir dire, especially in light of subsequent events that revealed the juror "was actually biased against Defendants."[43]

Considering the myriad procedural safeguards in place to avoid the seating of even one biased juror, out of twelve, it is inconceivable that, during a bench trial when the judge is the sole factfinder, a trial may proceed when that judge is biased.  To do so is to conduct a trial before an unfair tribunal, violating the fundamental requirement for an acceptable trial.  We therefore hold today that the right to an impartial trial extends to a bench trial, and that such right cannot be waived by a defendant.

The Commonwealth asserts, and the state courts found,

---

[41] *Singer v. United States*, 380 U.S. 24, 36 (1965).

[42] *United States v. Josefik*, 753 F.2d 585, 588 (7th Cir. 1985).

[43] *United States v. Parse*, 789 F.3d 83, 120 (2d Cir. 2015) (internal quotation marks omitted).

14

that Judge Richette did not show herself to be "actually biased" against McKernan and, consequently, counsel was not ineffective for failing to move for recusal.[44] The state courts applied the wrong constitutional test and compounded the error by finding that counsel was not ineffective. The Supreme Court has held that allegations of bias rise to the level of a constitutional deprivation when there is the "probability of unfairness" and there exists "a possible temptation to the average man as a judge not to hold the balance nice, clear and true between the State and the accused."[45] As an example, in *Mayberry v. Pennsylvania*, two *pro se* defendants directed near constant abuse at a state trial judge until the trial judge held them in contempt.[46] The Supreme Court held that the judge, as the victim of the contemnor's outbursts, was too close to the proceedings to be impartial enough to make the relevant contempt findings.[47]

---

[44] Because McKernan's claim of ineffective assistance is premised on the alleged bias of Judge Richette, we must make a threshold inquiry as to whether there were grounds to believe that Judge Richette was biased; counsel would not be ineffective for failing to move for recusal absent some perceived partiality. However, this threshold inquiry does not necessarily support the existence of an independent due process claim. A due process claim lies where a judge would have been required to recuse herself. An ineffective assistance of counsel claim, on the other hand, may lie where counsel fails to file a motion for discretionary recusal for which there are good grounds.

[45] *In re: Murchison*, 349 U.S. at 136 (internal quotation marks omitted).

[46] 400 U.S. 455, 460–62 (1971).

[47] *Id.* at 466 (internal quotation marks omitted).

The Supreme Court held that the judge in *Mayberry* was subjected to "highly personal aspersions" and "[i]nsults of that kind [that] are apt to strike at the most vulnerable and human qualities of a judge's temperament."[48] Here, we know that the Gibsons' websites struck "at the most vulnerable and human qualities of"[49] Judge Richette's temperament through the robing room conference transcript. In *Mayberry*, the Supreme Court noted that "a judge, vilified as was this Pennsylvania judge, necessarily becomes embroiled in a running, bitter controversy" and that "[n]o one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication."[50] In the instant matter, Judge Richette admitted to her belief that she had been slandered by the victim's family and indicated that she was determined to prove them wrong.

In a case such as McKernan's, where the defense theory of the case was at least partially based on arguing a lesser degree of culpability, Judge Richette's actions would have caused any competent attorney to seek recusal immediately.[51] Judge Richette offered the victim's family in a case in progress before her an opportunity to seek her recusal. She repeatedly implied that the assistant district attorney was the Gibsons' attorney, when he in fact had no responsibility to the family of the victim, but rather to all of

---

[48] *Id.* (internal quotation marks omitted).

[49] *Id.* (internal quotation marks omitted).

[50] *Id.* at 465.

[51] *Cf. Breakiron v. Horn*, 642 F.3d 126, 142 (3d Cir. 2011) (holding that counsel was ineffective for failing to strike an obviously biased venire panel).

the people of the Commonwealth of Pennsylvania. Most strikingly, Judge Richette sought repeatedly to assure the Gibson family that she was not "Let 'em Loose Lisa," a judge who was incapable of issuing harsh decisions.

As McKernan recognized, but McKernan's counsel did not, a finding that McKernan was guilty of some offense involving a lower standard of culpability would play directly into the narrative the Gibsons had published on their website: the caricature of "Let 'em Loose Lisa Strikes Again!" While McKernan's counsel's belief that Judge Richette was the best option for his client at the beginning of trial may have been a reasonable strategic decision, by the time Judge Richette held the robing room conference and revealed herself to be actively concerned with the her image on the internet and the victim's family's perception of her, any competent attorney would have realized that the strategy had to be revised.

Indeed, it appears that if McKernan had had no counsel at all, he would have made the decision to seek recusal. He expressed his concerns to his attorney, only to have his attorney inexplicably talk him out of those concerns, even going so far as to refer to his client's very valid issues as a "problem" to be solved. If counsel is ineffective only where his conduct was so deficient as to render his client *de facto* without counsel, McKernan's counsel may have been worse: he convinced his client to proceed before a tribunal that objectively had the appearance of bias against him. He advised his client to proceed before a court that was structurally deficient, something no competent attorney would ever do. Under § 2254, where "[t]he question is whether there is any reasonable argument that counsel satisfied

17

*Strickland*'s deferential standard,"[52] the answer here is "No." Consequently, McKernan's claim fulfills the first prong of *Strickland*.

*Strickland*'s second prong is easier to fulfill. To show prejudice, a petitioner need only "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[53] This standard "is less demanding than the preponderance standard."[54] Here, the standard is easily met.

As noted above, McKernan's defense centered on the degree of his culpability. McKernan's argument was that he had struck Gibson in self-defense and Gibson died when his head hit the curb. In view of Judge Richette's sensitivity to criticism for being lenient, it would not appear likely that she would now accept McKernan's defense of a lesser degree of homicide. There is evidence in the record from which an impartial judge could have found a lesser degree of homicide. McKernan's counsel himself admitted to the District Court that he was quite surprised by the verdict, thinking that there was virtually no chance under the facts of the case that McKernan would be found guilty of first degree murder. Thus, there is a reasonable probability that if McKernan's counsel had been effective and moved for recusal, the outcome of the trial would have been different. The second *Strickland* prong is met here.

---

[52] *McBride*, 687 F.3d at 103 (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

[53] *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001) (internal quotation marks omitted).

[54] *Id.*

Given this holding that petitioner met both prongs of the *Strickland* inquiry, it is unnecessary for us to reach the parties' other arguments, and we express no opinion as to their validity.

## IV

For the foregoing reasons, we will reverse the decision of the District Court and remand with instructions to grant the petition for habeas corpus unless, within 60 days of the remand, the Commonwealth of Pennsylvania decides to retry the charges against McKernan.